## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mark W. Hardy,

               Plaintiff,

v.

Unum Life Insurance Company of America,

               Defendant.

Court File No. 23-cv-563-JRT-JFD

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

## INTRODUCTION

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, Defendant Unum Life Insurance Company of America ("Unum") respectfully submits this Memorandum of Law in support of its Motion for Judgment on the Administrative Record. Unum is entitled to judgment because Plaintiff failed to sustain his burden of proof that he continued to be disabled from full-time performance of his regular occupation after December 10, 2020. Judgment in Unum's favor under *de novo* review is therefore appropriate.

## FACTS

**A.    The Policy.**

Unum issued Group Insurance Policy No. 327501 001 (the "Policy") to the law firm of Geraghty, O'Loughlin & Kenney, P.A., as replaced effective January 1, 2016.  See Declaration of Susan Goan, Exhibit A at UA-CL-LTD-001323.[1]

---

[1]    The page numbers cited were applied by Unum to aid in identification of document pages in the administrative record. Hereinafter, references to the Administrative Record appear solely by the last six digits of the number with the acronym "AR", e.g., "AR-000001".

The Policy provides in pertinent part:

   1.  Description of Eligible Classes

   Class 1 Partners and Shareholders…

   Class 1

   "Disability" and "disabled" means that because of injury or sickness:
1. the insured cannot perform each of the material duties of his regular occupation; or
2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness….

   Class 1 and Class 2
   Note: For attorneys, "regular occupation" means the specialty in the practice of law which the insured was practicing just prior to the date disability stated.

AR-001325; 001332.

The Policy further provides:

   Proof
a. Proof of claim must be given to the Company. This must be done no later than 90 days after the end of the elimination period.
b. If it is not possible to give proof within these time limits, it must be given as soon as reasonably possible. But proof of claim may not be given later than one year after the time proof is otherwise required.
c. Proof of continued disability and regular attendance of a physician must be given to the Company within 45 days of the request for the proof.
   d.  The proof must cover:
   i.     the date disability started;
   ii.    the cause of disability; and
   iii.   how serious the disability is.

AR-000025.

With respect to "Disability," the Policy provides the following:

DISABILITY

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

1. disability; and
2. regular attendance of a physician.
   The proof must be given upon request and at the insured's expense.

   The monthly benefit will not:

1. exceed the insured's amount of insurance; nor
2. be paid longer than the maximum benefit period.

   The amount of insurance and the maximum benefit period are show in the policy specifications….

AR-001334

With respect to the calculation of benefits, the Policy states:

MONTHLY BENEFIT

To figure the amount of monthly benefit:

1. Take the lesser of:
a. 60% of the insured's basic monthly earnings; or
b. the amount of the maximum monthly benefit shown in the policy specifications; and
2. Deduct other income benefits, shown below, from this amount.

But, if the insured is earning more than 20% of his indexed pre-disability earnings in his regular occupation or another occupation, then the monthly benefit will be figured as follows:

1. During the first 12 months, the monthly benefit will not be reduced by any earnings until the gross monthly benefit plus the insureds earnings exceed 100% of his indexed pre-disability earnings. The monthly benefit will then be reduced by that excess amount.

2928459

2. After 12 months, the following formula will be used to figure the monthly benefit:

(A divided by B) x C
A= The insured's "indexed pre-disability earnings" minus the insured's monthly earnings received while he is disabled.
B = The insured's "indexed pre-disability earnings."
C = The benefit as figured above, but not including adjustments under the Cost of Living Adjustment provision.

The benefit payable will never be less than the minimum monthly benefit shown in the policy specifications.

Proof of the insured's monthly earnings must be given to the Company on a quarterly basis. Benefit payments will be adjusted upon receipt of this proof of earnings.

AR-001334-001335.

The Policy defines the following relevant terms:

"Basic monthly earnings" means the insured's average monthly earnings as figured:
a. From the W-2 form (from the box which reflects wages, tips and other compensation) received from the employer for the calendar year just prior to the date disability begins; or
b. For the period of employment if no W-2 form was received.

"Indexed pre-disability earnings" means the insured's basic monthly earnings in effect just prior to the date his disability began adjusted on the first anniversary of benefit payments and each following anniversary. Each adjustment will be based on the lesser of 10% or the current annual percentage increase in the Consumer Price Index.

Note: The Consumer Price Index (CPI-W) is published by the U.S. Department of Labor. The Company reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-W.

"Monthly Benefit" means the amount payable by the Company to the disabled insured.

Net Monthly Benefit

The net monthly benefit means the amount determined by reducing the insured's amount of insurance by other income benefits and any reductions for earnings. The net monthly benefit will be determined each month. For the purpose of calculating adjustments, the net monthly benefit will include any prior cost of living adjustments.

AR-001326; 001330; 001340.

**B.    Plaintiff's Prior Claim for LTD Benefits.**

Plaintiff is a partner at Geraghty, O'Loughlin & Kenney, P.A., and is eligible for long-term disability ("LTD") benefits under the Policy as a "Class 1" employee. Plaintiff practices in the specialty area of medical malpractice trial attorney. Complaint [Docket No. 1].

In October 2016, Plaintiff began experiencing pain in the groin area and a subsequent evaluation revealed a lesion in the left superior pubic ramus. AR-003504. In 2017, he was diagnosed with multiple myeloma. He underwent an autologous bone marrow transplant and related therapy in late 2017. Plaintiff received LTD benefits from Unum for the period of September 29, 2017 through January 31, 2018.   He returned to part-time work as a trial attorney in January 2018, and then resumed full-time work as a trial attorney on February 1, 2018. See AR-003703.

**C.    Plaintiff's Second Claim for LTD Benefits.**

On February 11, 2019, Unum received a second LTD claim from Plaintiff, indicating that he had reduced his work hours beginning February 1, 2019. AR-001248. Plaintiff provided the following the basis for his claim: "Effects of multiple myeloma and side effects of prior treatments and ongoing maintenance chemotherapy include neuropathy,

fatigue, lack of stamina, nausea, diarrhea and pain and prevent me from working full time and from carrying out all my responsibilities as a trial attorney and litigator including handling trials, lengthy depositions, lengthy court appearances, long conferences with clients and expert witnesses, traveling long distances and working long days. Frequent medical assessment and care also prevent me from working full time." AR-001249.

Plaintiff's employer confirmed that he was working part-time, and that Plaintiff's gross part-time earnings were $4,791.67 on a semi-monthly basis. AR-001255-001256. The employer provided three months of payroll records based on "Salary Only/Current Earnings," as opposed to twelve to twenty-four months of records related to "Bonus/Commissions Included." AR-001256.

In a February 12, 2019 Attending Physician Statement, Gregory Vercellotti, M.D., Plaintiff's treating oncologist/hematologist, indicated "multiple myeloma" as the primary diagnosis affecting Plaintiff's functional capacity. AR-001277. He provided a secondary diagnosis of Vitamin B12 deficiency. AR-001277. Dr. Vercellotti indicated that Plaintiff's symptoms of fatigue, neuropathy, pain, nausea and diarrhea "limits him to light office work on a part time basis as he feels able to do," from February 1, 2019 through "indefinite." AR-001279. Dr. Vercellotti's treatment records from December 15, 2018 indicated that Plaintiff was in "very good partial remission" and noted his symptoms may be due to B12 deficiency and side effects from Revlimid. AR-001281. Dr. Vercellotti indicated that he would be seeing Plaintiff again in three months. AR-001281.

On June 12, 2020, Unum requested a Disability Status Update. AR-001807-001808. Plaintiff indicated that he works "several hours a day as a lawyer and partner in a law firm.

When not working, I exercise, do household chores, spend time with my wife and daughter." AR-001850. He answered "No" to whether his condition prevented him from caring for himself, or required assistance with activities of daily living. AR-001850. He indicated that his sole treating provider was Dr. Vercellotti. AR-001851.

On July 8, 2020, Dr. Vercellotti provided an updated Attending Physician Statement indicating that Plaintiff reported symptoms of "neuropathy, fatigue, nausea, diarrhea, chronic pain, lack of stamina." AR-001865. Dr. Vercellotti noted: "Mark has multiple myeloma, post stem transplant, post radiation, post chemotherapy and presenting remaining on maintenance chemotherapy," and his multiple symptoms "limit his ability to carry out all of his responsibilities as a litigator. This limits him to light office work on a part time basis as he feels able to do." AR-001866.

Dr. Vercellotti attached treatment notes from April 14, 2020, wherein Plaintiff sought "evaluation for multiple myeloma, now about 30 months post autologous bone marrow transplant." Dr. Vercellotti noted that "Mark is feeling pretty good today. He has no fever, chills, nausea or vomiting." AR-001868. He further noted that, "Mark is doing well, Karnofsky 100 and at this time is in a stringent CR of his myeloma. Mark feels that his neuropathy has improved since being on B12 replacement…Labs look good as shown below." AR-001869. The examination and systems review was normal. AR-001868.

On September 11, 2020, Unum's Vocational Rehabilitation Consultant, Amanda Marosy, MA, CRC, performed a vocational assessment/occupational identification. AR-002042-002044. Marosy identified Plaintiff's occupation as a "Trial Attorney," which aligned with the eDOT occupation of "Attorney Litigation." AR-002042. Specifically, both

7

occupations "involve performing consultations, advisory, arbitration, and trial work, and carries out the legal processes necessary to affect the rights, privileges and obligations of the client." AR-002042. Marosy identified the material and substantial duties of both Trial Attorney and Litigation Attorney as: "Works directly with and represents plaintiffs or defendants to bring or pursue a lawsuit to be tried in a court of justice for the purpose of enforcing a right when settlement negotiation and arbitration efforts fail. Conducts criminal and civil lawsuits, draws up legal documents, and advises clients as to legal rights. Gathers evidence, conducts research, interviews clients and witnesses, prepares legal briefs and develops strategy, arguments, and testimony in divorce, civil, criminal, and other cases to formulate an offense or defense or to initiate legal action. Studies legal data to determine advisability of defending or prosecuting lawsuit. Files brief with court clerk. Represents client in court and before quasi-judicial or administrative agencies of government. Studies the Constitution, statutes, decisions, and ordinances of quasi-judicial bodies. Interprets laws, rulings, and regulations for individuals and businesses." AR-002042-002043.

Based on the Dictionary of Occupation Titles (DOT) and eDOT, Marosy identified the physical and cognitive/mental demands of the occupation of Trial/Litigation Attorney. AR-002043. The physical demands constituted "Sedentary Work," meaning mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing pulling up to 10 lbs occasionally, constantly talking and hearing, frequently reaching, handling, fingering, and near acuity, and occasionally reaching upward, reaching downward, keyboard use and visual accommodation." AR-002043. The mental/cognitive demands were identified as: (1) "Directing, Controlling, or Planning Activities for Others: Involves

8

accepting responsibility for formulating plans, designs, practices, policies, methods, regulations, and procedures for operations or projects; negotiating with individuals or groups for agreements or contracts; and supervising subordinate workers to implement plans and control activities"; (2) "Making Judgments and Decisions: Involves solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experiences, or quantifiable or factual data"; (3) "Dealing with People: Involves interpersonal relationships in job situation beyond receiving work instructions"; and (4) "Performing a Variety of Duties: Involves frequent changes of tasks involving different aptitudes, technologies, procedures, working conditions, physical demands, or degrees of attentiveness without loss of efficiency or composure." AR-002043.

In September 2020, Unum sought updated information from Dr. Vercellotti. AR-002075. In a response dated September 22, 2020, Dr. Vercellotti repeated the diagnosis of multiple myeloma and the symptoms previously reported by Plaintiff. AR-002076. He indicated that Plaintiff "should limit his work to light office work on a 50% part time basis." AR-002076.

Dr. Vercellotti's treatment notes from October 14, 2020, indicate that Plaintiff's multiple myeloma is "in remission." AR-002234. The radiographic bone survey and PET/CT scans showed "Stable postoperative changes of curettage and cement packing in the left superior public rami. No new lystic lesion or compression fracture identified." AR-002231. Dr. Vercellotti noted that, "Mark is doing well, Karnofsky 100 and at this time in a stringent CR of his myeloma. Mark feels that his neuropathy has improved since being

9

on B12 replacement. Mark will continue on the Revlimid 10 mg for 21 days on, 7 days off. He should get Zometa in January and I will see him in 6 months. Labs look good as shown below. No monoclonal in serum or urine Kappa/lambda ratio good. B12 looks ok." AR-002231.

In a November 5, 2020 telephone call, Plaintiff reported to Unum that Dr. Vercellotti is his only treating physician and prescribes his medication. AR-002253. Plaintiff reported that he "does the biking daily. He goes outside if he can and he has a trainer. He said if you dive into the research the best thing is exercise…He tries to exercise about an hour every day. He said he is able to travel, he hikes. He is trying to be very transparent. Before COVID he was going to YMCA and he hasn't been since and he canceled his membership." AR-002253. When asked about his biggest barrier to returning to full-time work, Plaintiff identified symptoms of "fatigue, diarrhea, neuropathy and N&V."  AR-002253.

On November 10, 2020, based on her review of the available medical and vocational information, Unum's Senior Clinical Consultant Diane Mace opined that such information "does not support Claimant would be precluded from the above stated demands on a full-time basis." AR-002260. Mace noted that, "[w]hile claimant reports treatment side effects of fatigue, diarrhea, neuropathy, and nausea/vomiting; OVNs over the last year indicate he is doing well, he denies fever/chills/nausea/vomiting, and the neuropathy is improved with B 12 replacement…Claimant's Karnofsky score is 100 (able to carry on normal activity and no signs of disease), he has achieved complete response, and Claimant is described as exercising regularly, traveling, going on 90-mile treks, and skiing. The absence of disease

2928459

and level of activity is inconsistent with an inability for seated tasks with the ability for positional changes." AR-002260.

Plaintiff's medical information was then referred to Robert Nosaka, M.D., Board Certified in Internal Medicine. AR-002287-002295. Dr. Nosaka contacted Dr. Vercellotti via letter to obtain clarification on the restrictions and limitations imposed on Plaintiff. AR-002334-002336. Based on what Plaintiff told him, Dr. Vercellotti indicated "can work 2.5-5 hours per day." AR-002336-002337.

Dr. Nosaka then detailed his review of the medical and vocational records, noting that Dr. Vercellotti's most recent physical examinations of Plaintiff were normal, that Plaintiff reported "feeling pretty good" with no signs of acute distress, and that Plaintiff was physically active and exercising daily. AR-002288. Based on the following explanation, Dr. Nosaka opined that Plaintiff was not precluded from performing the full-time duties of his occupation.  He noted:

> 1) Plasmacytoma/multiple myeloma
> Diagnostics reveal normal findings and no evidence of disease/recurrence. Thus, given the unremarkable findings, OSP opines that the insured is not precluded from performing the full-time duties of the occupation.
> Diagnostics:
> 9/25/19 bone marrow biopsy
> Marrow cellularity with trilineage hematopoiesis with no evidence of plasma cell neoplasm
> 9/25/19 labs revealed normal peripheral hemogram and differential
> 9/25/19 PET/CT revealed no new evidence of disease.
> 4/10/20 labs revealed:
> Normal calcium, albumin
> Normal CBC with normal differential
> Normal kappa free light chain
> 10/5/20 labs revealed:

11

> Normal calcium, albumin
> Normal CBC with normal differential
> Normal kappa free light chain and lambda light chain
> 10/7/20 bone survey limited revealed:
> Stable post-operative changes of curettage and cement packing in
> the left superior pubic rami
> No new lytic lesion of compression fracture
>
> Physical exams are normal with a Karnofsky score of 100. There
> are no significant findings such as distress, weight loss,
> neurologic/cognitive deficits, or abnormal musculoskeletal
> findings. The Karnofsky score and normal evaluations indicate
> that the insured is able to carry on normal activity, and there is no
> evidence of disease[.]
>
> Treatment notes vitamin B12 which significantly improved
> peripheral neuropathy. Revlimid is taken for maintenance therapy
> with complaints of loose stools due to the medication. Other
> medications are Zometa likely for osteopenia, clindamycin, and
> Ativan. There are complaints of significant pain. The records do
> not include medications for neuropathy such as gabapentin, loose
> stools such as Lomotil or Imodium, or pain medications which
> would be expected for significant impairment due to those
> respective conditions. There have been no referrals to specialists
> such as Gastroenterology or Neurology. Thus, given the minimal
> medications and the conservative treatment, OPS opines that the
> insured is not precluded from the full-time duties of the
> occupation.
>
> He bikes daily, tries to exercise an hour each day, and has a trainer.
> He can ski, travel, and hike and went on a 90 mile trek with his
> wife and daughter. He has been working part-time for more than 1
> year which allows for work hardening. His level of activity is
> inconsistent with an inability to perform his occupation full-time
> which is performed at a sedentary level of physical demand.

AR-002293-00295.

Because Dr. Nosaka reached a different conclusion than Dr. Vercellotti regarding

Plaintiff's functional capacity for full time work, he recommended that Unum conduct an

additional medical review. AR-002295. Unum then referred Plaintiff's medical information

to Designated Medical Officer, Herbert Dean, M.D., Board Certified in Oncology, Hematology and Internal Medicine. AR-002299-00301. Dr. Dean completed "a full review of the medical records including the reviews by the OSP, Dr. Nosaka, the insured's physicians including Drs. Vercellotti, oncology (records from post-transplant) as well as the other pertinent documents in the file." AR-002300. Based on that review, Dr. Dean concluded that Dr. Vercellotti's opinion was not well supported by medically acceptable clinical or laboratory diagnostic techniques or other evidence in the claim file. AR-002301. Specifically, Dr. Dean noted that Plaintiff "has achieved a stringent complete remission of this multiple myeloma, including repeat bone marrow and flow cytometry, surveillance imaging, lab studies—CBC, chemistries, immunoglobin levels including light chains, and is tolerating maintenance  Revlimid, with a normal performance status. He is noted to be active, exercising including biking…and has completed his re-immunizations with no h/o increased infections[.]" Dr. Dean concluded "that there are no R and L's present resulting from his diagnosis and treatment of multiple myeloma or other conditions that prevent him from the occupational requirements noted above with the additional proviso that he adhere to recommended hygienic safety measures/CDC guidelines during the COVID-19 pandemic[.]" AR-002301.

On November 30, 2020, Unum requested a copy of Plaintiff's job description from his employer. AR-002323. Plaintiff's employer provided a list of job duties that were consistent with Unum's vocational assessment. AR-002345-00236. This information was provided to Vocational Rehabilitation Consultant Marosy and she supplemented her report with an addendum to reflect the information. In November 2020, Dr. Nosaka also requested

additional information from Dr. Vercellotti, who provided correspondence reiterating that Plaintiff should continue to work part-time based on his symptoms.

In December 2020, Unum requested that Dr. Nosaka conduct a medical re-review of Plaintiff's claim.  002354. Dr. Nosaka again opined that the restrictions/limitations imposed by Dr. Vercellotti were not supported. 002356. Specifically, he reasoned: "there has been sufficient time to recover from adverse side effects and to acclimate to previous and current treatment. The insured has been able to perform the duties of his occupation part-time, which is performed at sedentary level of physical demand, for more than year to allow for work hardening. Additionally, as the records indicate, he has been able to engage in extensive activities for leisure and exercise. Thus, given the progression of time, the work hardening, the minimal physical demands of the occupation, and the level of activity, OSP opines that the insured is not precluded from performing the full-time duties of the occupation." 002356. He further stated: "To a reasonable degree of medical certainty, OSP opines that the additional occupational duties do not alter prior OSP opinion that the medical evidence does not support the insured was/is precluded from 11/5/20 forward (the date of the telephone conversation) from performing the sustained full-time activities noted above concurrent with his treatment." 002357.

Given the continued disagreement between Drs. Vercellotti and Nosaka, along with the additional occupational information provided by Plaintiff's employer, Unum also requested that Dr. Dean re-review Plaintiff's medical information. 002358. Dr. Dean opined that his prior opinion "is not altered by additional information provided of physical demands" nor by Dr. Vercellotti's December 1, 2020 letter. 002360-2361.

2928459

In December 10, 2020 correspondence, Unum advised Plaintiff of its decision to discontinue payment of benefits effective immediately. 002377. In the letter, Unum detailed the basis of its decision:

> A physician, who is board certified in internal medicine, contacted Dr. Vercellotti to inquire about your functional capacity. Dr. Vercellotti responded stating that he was in support of your disability. He wrote, in part, that you seem to do well in dealing with people, and you are able to do other tasks, but he did not feel that you could work for a full eight hour day. He wrote that you are capable of working five and half hours per day occasionally and frequently might need to work only three and a half to five and a half hours per day. Since the reviewing physician did not agree with Dr. Vercellotti's conclusions, this physician completed a full review of your medical records.
>
> The reviewing physician found no support for restrictions that would prevent you from the full-time activities required in your occupational duties. In reaching this conclusion, the reviewing physician noted the following:
>
> Your physical exams are normal with a Karnofsky score of 100. There are no significant findings documents in your records such as distress, weight loss, neurological/cognitive deficient, or abnormal musculoskeletal findings. The Karnofsky score and normal evaluations indicate that you are able to carry on normal activity, and there is no evidence of disease.
>
> Your records document that treatment with vitamin B12 has significantly improved your peripheral neuropathy. You take Revlimid for maintenance therapy and have reported loose stools since this medication was started. Your other medications are Zometa likely for osteopenia, clindamycin, and Ativan. The available information does not indicate that you require medications for neuropathy symptoms such as gabapentin, or medications for loose stools such as Lomotil or Imodium, or that you require pain medications which would be expected for significant impairment due to these conditions. There have been no referrals to specialists such as gastroenterology or neurology. Your use of minimal medications and conservative treatment, support that you are no precluded from the full-time duties of your occupation, which are noted above.
>
> You have reported activities including daily biking and exercising an hour each day. You can ski, travel, and hike. Your records document that you went on a 90-mile trek with your wife and daughter. You have been working part-time for more than one year which has allowed for work hardening.

Your level of activity is inconsistent with an ability to perform your occupation full-time which is performed at a sedentary level of physical demand.

Since the reviewing physician disagreed with Dr. Vercellotti, a second physician, who is board certified in Hematology, Oncology, and Internal Medicine, reviewed your file. The second reviewing physician agreed with our assessment that the available information does not support your inability to work full-time. In reaching this conclusion, the second physician noted the following:

The medical information supports that you have achieved a stringent complete remission of your multiple myeloma, including on repeat bone marrow and flow cytometry, surveillance imaging, and lab studies including CBC, chemistries, and immunoglobin levels including light chains. You are tolerating maintenance Revlimid, with a normal performance statutes, Karnofsky score of 100.

You are active, exercising including biking, and have completed your re-immunizations with no history of increased infections.

There are no restrictions or limitations present resulting from your diagnosis and treatment of multiple myeloma or other conditions that prevent you from the occupational requirements noted above. You are recommended to adhere to hygienic safety measures/CDC guidelines during the COVID-19 pandemic including appropriate PPE-facial protection (mask), use of handwashing/sanitizers, and social distancing as feasible.

In conclusion, the reviewing physicians have agreed the available information supports a finding that you can perform full-time activity at a level that is consistent with the demands of your occupational duties.

002379-002380.

### D.    Plaintiff's Appeal of Discontinuance of Benefits.

In correspondence dated February 11, 2022, Plaintiff, through counsel, appealed the discontinuation of his LTD benefits. 002447-002463. The appeal letter challenged the opinions of Unum's medical reviewers, and Unum's vocational assessment of the physical and mental demands of Plaintiff's occupation. 002453-002459. Additional evidence provided with the appeal included a letter from Dr. Vercellotti dated August 23, 2021 (along

with his Curriculum Vitae), Declarations from Mark and Tanya Hardy (Plaintiff's spouse), and Declarations from two of Plaintiff's long-time colleagues, medical literature, updated medical records from October 13, 2016 to the date of the appeal letter, and an Independent Employability Assessment by Ken Askew, MA, CRC. 002459.

In his August 23, 2021 correspondence included in the appeal, Dr. Vercellotti described the symptoms Plaintiff reported: "fatigue and lack of stamina, especially near the end of his Revlimid cycle, and diarrhea approximately 5 to 7 days a week that improves during his week of Revlimid. He explained that he continues to have pelvic pain that limits how long he can sit in an office chair without getting up to stretch and requires him, for example, to use his arms and hands to lift his left leg when he gets into or out of his car. He described regular nausea with loss of appetite. He again reported neuropathy with tingling and numbness in the toes and fingers that have made typing and writing somewhat more difficult….His reported symptoms are credible and consistent with the course of treatment." AR-002679.

The Independent Employability Assessment provided on appeal summarized the information that Plaintiff directly provided to Mr. Askew during the "diagnostic interview" and other information previously provided to Unum. AR-002587-002597. Mr. Askew opined that occupational information directly from the employer was more reliable than information contained in the Dictionary of Occupational Titles (DOT) and Occupational Outlook Handbook (OOH), although acknowledging these are reliable sources of data. AR-002592. Mr. Askew concluded that Plaintiff "does retain residual employability," but opined that he is working at maximum vocational capacity. AR-002596.

17

2928459

Kelly Marsiano performed a vocational file review in light of Mr. Askew's report. AR-003608-003610. Responding to Mr. Askew's comments on Unum's prior vocational review, Ms. Marsiano explained: "The insured has consistently provided his job title as Trial Attorney and Litigation Attorney. The employer has provided similar information. Therefore, Litigation Attorney as described would meet the specialty definition as if different from Attorney…Regarding cognitive demands of the insured's occupation, the demands reported are temperaments (work situations) and are included the original DOT and eDOT. Additionally, the definitions of those were included in VRC Marosy's reviews to describe the work situations including frequently changing focus on tasks, interpersonal relationships, persuading others to change attitudes or opinion, and solve problems reaching conclusions based on subjective or objective criteria, in which the insured would be placed during the course of completing duties as an Attorney Litigation. These do speak to the mental demands of the occupation…The insured does not report additional specialty training, licensure or certification and indicates he has a JD and bar admissions as listed above. His trial work, depositions, research and time with clients is included in the description of duties of the occupation of Attorney Litigation. Travel is included as is working over 40 hours per week. Therefore, the information provided on appeal from Kenneth Askew does not alter the 12/4/20 vocational review." AR-003609-003610.

On appeal, Unum requested a medical review from Appeals Physician, Neal Greenstein, M.D., Board certified in Internal Medicine. AR-003620-003622. Dr. Greenstein opined that the evidence did not support restrictions and limitations as of December 11, 2020. AR-003620. Dr. Greenstein noted that, "[t]he medical information is

inconsistent and insufficient. The claimant, his wife, attorney, colleague, and Dr. Vercellotti advocate that his symptoms of fatigue, decreased stamina, cognitive issues, nausea, musculoskeletal pain, and neuropathy allow part-time and preclude full-time performance of the occupation demands under review." AR-003620. He further noted, however, that "[o]ver the last two years, the claimant has been seen virtually at low-intensity 6-month intervals by Dr. Vercellotti in April/October of 2020 and 2021. He self-reported each time he was feeling pretty good, ROS (review of systems) was negative in 2020, neuropathy was improved on B12, he was exercising regularly (including biking), the Karnofsky score was 100 (normal, no complaints, no evidence of disease), and he was in stringent complete remission." AR-003620. Dr. Greenstein concluded that, "the existence, intensity, frequency, and duration of the claimant's reported symptoms. . . is not consistent with a physical exam, diagnostic findings, treatment intensity, and reported activities. I acknowledge the claimant's reported symptoms, the various letter, and the 11/202 employability assessment. However, it should be noted there was no in-person visits, the documented virtual exams, including a Karnofsky score of 100, and diagnostics were clinically unremarkable." AR-003621.

Unum provided Marsiano's vocational review and Dr. Greenfield's appeal review to Plaintiff and provided the opportunity to respond. Plaintiff's counsel responded via correspondence dated April 11, 2022, with attachments. Unum provided the correspondence and attachments to Dr. Greenfield who determined the information did not change his opinion. In correspondence dated May 4, 2022, Unum upheld its

discontinuation of LTD benefits and offered a detailed explanation for its decision. AR-003677-003682.

## **LEGAL ARGUMENT**

## I. **UNUM IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD.**

"The district court reviews the decision of an administrator who lack[s] discretionary authority *de novo,* acting as factfinder on the administrative record." Avenoso v. Reliance Standard Life Insurance Co., 19 F.4th 1020, 1025 (8th Cir. 2021). Under *de novo* review, "[p]arties that wish the district court to exercise its fact finding function under Federal Rules of Civil Procedure 39(b) and 52(a)(1) to decide the case on the administrative record should ask the district court to do exactly that." *Id*. at 1026. Unum moves for judgment in its favor pursuant to Rule 52(a)(1), and requests that the Court "decide the case on the administrative record without giving either side the benefit of all reasonable inferences but instead weighing the evidence and finding facts." Id.

Courts have recognized that, "[i]n a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the court does not determine whether there is an issue of material fact, but actually decides whether the plaintiff [is entitled to benefits] under the policy." Hulbert v. Hartford Life & Accident Ins. Co., 2021 U.S. Dist. LEXIS 144344, *3 (N.D. Cal. Aug. 2, 2021) (citing Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999)). "In making that determination, the court must 'evaluate the persuasiveness of conflicting testimony and decide which is more likely true' in order to make findings of

fact that will be subject to review under a clearly erroneous standard if appealed." Id.  As

discussed below, Unum is entitled to judgment in this matter.

    **A.**    **There is No Conflicting Evidence of the Physical and Mental/Cognitive Demands of Plaintiff's Occupation.**

During claim administration, Plaintiff argued that Unum failed to consider his

specialized occupation of "Trial Attorney," when identifying the physical and

mental/cognitive demands. This assertion conflates the concepts of occupation, on the one

hand, and underlying occupational demands, on the other.

The Administrative Record is clear that the vocational assessment/occupation

identification utilized by Unum in reviewing Plaintiff's claim applied the more specialized

occupation of "Attorney Litigation" (as opposed to "Attorney") consistent with the

information provided by Plaintiff in support of his claim and the Policy. Specifically, the

Policy provides that: "For attorneys, 'regular occupation' means the specialty in the

practice of law which the insured was practicing just prior to the date disability started."

AR-001332. The description of this occupation in the vocational assessment encompasses

the material duties that Plaintiff performed based on his own description, the description

of his colleagues in their supporting statements, and the employer's job description,

including trial practice. Compare AR-002043, with AR-002345-002346.

Unum then properly identified the physical and mental/cognitive demands

associated with Plaintiff's specialized occupation of Trial/Litigation Attorney utilizing

well-established and well-recognized sources—the DOT, OOH, and eDot. Plaintiff has not

and cannot persuasively argue that these physical and mental/cognitive demands, while

stated in more generally applicable terms, are inconsistent with or contrary to the demands required of him as a Trial/Litigation Attorney. See, e.g., AR-002043 ("Involves…degrees of attentiveness without loss of efficiency or composure."). This is particularly true as Unum expressly considered that the demands of a Trial/Litigation Attorney included travel and work weeks exceeding forty (40) on a regular basis.

On appeal, Unum's vocational reviewer correctly explained the conflation by Plaintiff (and Kenneth Askew, who performed Plaintiff's Employability Assessment for appeal) between a specialized occupation and the underlying demands:

> Kenneth Askew reports that the insured understood his policy was to cover his area of specialization as a trial lawyer and not the 'generic' description for all lawyers. Of note, in the LTD policy, it states 'For attorneys, 'regular occupation' means the specialty in the practice of law which the insured was practicing just prior to the date disability started'…Therefore, Litigation Attorney as described would meet the specialty definition as it differs from Attorney… Regarding cognitive demands of the insured's occupation, the demands reported are temperaments (work situations) and are included in the original DOT and eDOT…These do speak to the mental demands of the occupation. The occupation of Attorney Litigation as described in VRC Marosy's vocational review addendum is most consistent with the insured's description of duties including trial work…His trial work, depositions, research and time with clients is included in the description of duties of the occupation of Attorney Litigation. Travel is included as is working over 40 hours per week."

AR-003609-003610.

Based on the foregoing, the Court should find that Unum correctly identified and considered the appropriate physical and mental/cognitive demands of Plaintiff's specialized occupation in its vocational assessment and that Plaintiff must prove he is restricted and limited from performing these demands in order to be entitled to ongoing disability benefits under the Policy.

2928459

**B.    Plaintiff did not Satisfy His Burden of Proving Entitlement to Ongoing Benefits.**

It is well-settled that Plaintiff bears the burden of proving by a preponderance of the evidence that he is disabled within the meaning of the Policy. Johnson v. G&K Servs., Inc. Long Term Disability Plan, 2017 U.S. Dist. LEXIS 200924, *12-13 (D. Minn. Sept. 27, 2017), adopted (D. Minn. Dec. 5, 2017) ("Mr. Johnson bears the burden of proving that he is disabled within the meaning of the plan and entitled to benefits.") (citing Farley v. Benefit Tr. Life Ins. Co., 979 F.2d 653, 658 (8th Cir. 1992) (finding that the burden rests on the plaintiff when the question is related to the scope of a plan's benefits coverage rather than the scope of an exclusion relied upon to deny coverage."); accord Morgan v. Unum Life Ins. Co. of Am., 346 F.3d 1173, 1177 (8th Cir. 2003).

Where a claimant fails to sustain his burden of proof, judgment in favor of the plan is appropriate, even under de novo review. See Donatelli v. Home Ins. Co., 992 F.2d 763, 765 (8th Cir. 1993). See also Sweno v. Liberty Life Assurance Co., No. 02-376 (JRT/FLN), 2003 U.S. Dist. LEXIS 4115, at *13 (D. Minn. Mar. 10, 2003) ("Plaintiff has simply not shown that he cannot work…"); Phillips v. Aetna Life Ins. Co., No. 20-2048 (PAM/DTS), 2021 U.S. Dist. LEXIS 225849, at *8 (D. Minn. Nov. 22, 2021) ("Phillips's 'belief' is irrelevant. Aetna was required to examine the objective evidence in the record to determine whether he met the plan's definition of disabled during the elimination period. It did so, and properly determined that the objective evidence did not support Phillips's claimed impairments").

In <u>Johnson</u>, this Court recognized: "The controlling issue…is not whether [a plaintiff] experiences an array of symptoms, but whether [a plaintiff] has proved by a preponderance of the evidence that a medical condition of physical origin renders [the plaintiff] unable to perform the duties of his job." <u>Johnson</u>, 2017 U.S. Dist. LEXIS 200924 at *17-18. For similar reasons as in <u>Johnson</u>, Plaintiff failed to satisfy this burden because the greater weight of the evidence in the Administrative Record does not support that, despite his "array of symptoms," he was disabled from full-time performance of his regular occupation of Trial/Litigation Attorney after December 10, 2020.  <u>Black's Law Dictionary</u>, p. 1301 (9th ed. 2009) (defining "preponderance of the evidence").

First, while Plaintiff was undisputedly diagnosed with the medical condition of multiple myeloma, "[w]here an ERISA policy requires the claimant to show that an injury or sickness prevents the performance of material occupational duties, that person is not disabled simply because he or she has a demonstrated medical condition." <u>Johnson</u>, 2018 U.S. Dist. LEXIS 200924 at *17-18.

In October 14, 2020, shortly before benefits were discontinued, Dr. Vercellotti's treatment notes reflected that Plaintiff's multiple myeloma was "in remission," and objective testing showed "stable postoperative changes of curettage and cement packing in the left superior public rami. No new lystic lesion or compression fracture identified." AR-002231; 00234. Dr. Vercellotti noted that, "Mark is doing well, Karnofsky 100 and at this time in a stringent CR [remission] of his myeloma." AR-002231. Thus, the multiple myeloma was not a disabling condition precluding Plaintiff from full-time work as a Trial/Litigation Attorney on or after December 10, 2020.

Second, there was no evidence that Plaintiff's reported symptoms (neuropathy, fatigue, lack of stamina, nausea, diarrhea and pain) related to his prior and current treatments for multiple myeloma were severe enough to be disabling. Under the Policy, Plaintiff is required to provide proof of "how serious the disability is." AR-000025. From an objective evidence standpoint, Dr. Vercellotti, who was Plaintiff's sole treating physician, consistently observed that Plaintiff appeared in no acute distress, demonstrated normal mentation and cognition, and his examinations and systems reviews of Plaintiff were routinely normal/unremarkable. Dr. Vercellotti did not refer Plaintiff to other providers for his symptoms (such as a Gastroenterologist), nor ordered symptom-specific testing and diagnostics (such as neurological testing, cognitive testing, or a sleep study). As noted in <u>Johnson</u>, "the absence of objective evidence demonstrating significant functional limitations is certainly relevant and cuts against a finding that he has carried his burden." 2017 U.S. Dist. WL9274764 at *7.

Subjectively, in the visits with Dr. Vercellotti preceding the discontinuation of benefits, Plaintiff reported "feeling pretty good," with no fever, chills, nausea or vomiting. AR-001868; AR-002231. Plaintiff also reported marked improvement in his neuropathy after being on B12 replacement, and he did not request any medication or referrals from Dr. Vercellotti for his symptoms. AR-001869. Plaintiff reported activities like extended exercise, biking, traveling, skiing, and a 90-mile canoeing trek that are physiologically inconsistent with impairing symptoms of, for example, fatigue, lack of stamina, diarrhea and pelvic pain.

2928459

Third, while Dr. Vercellotti imposed restrictions and limitations on Plaintiff returning to full-time work based on his symptoms, this was based on Plaintiff's self-reports of his perceived functional ability. In his responsive communication to Dr. Nosaka, for example, Dr. Vercellotti stated: "I did support his disability claim. **Mark makes it very clear to me** that he cannot spent [sic] 8 hours in the office thinking clearly about depositions or having the ability to provide his clients with optimal attention." AR-002337 (emphasis added); see, e.g., AR-001866 (Dr. Vercellotti's assessment that the reported symptoms "limit his ability to carry out all of his responsibilities as a litigator. This limits him to light office work on a part time basis **as he feels able to do**") (emphasis added); AR-001279 (same).

As set forth in Plaintiff's lengthy and comprehensive correspondence to Unum in support of his appeal, Plaintiff's self-limitations on full-time work are more reflective of the perception that his symptoms have impeded return to his pre-illness baseline, as opposed to being severely disabling. AR-002650-002669; see also Johnson, at *10 ("And although he claims that he can neither work at a computer, nor engage in complex thinking as his job requires, the record contains multiple well-drafted, organized and intelligent emails, letters and appeal documents from Mr. Johnson that appear to have been written on a computer."). These circumstances are analogous to Johnson:

> Mr. Johnson emphasizes the opinions of his primary care physician, Dr. Kevin Nelson, which he says support his claim of disability. Dr. Nelson's March 27, 2014 statement outlines Mr. Johnson's restrictions and limitations as 'only light duty positions absent complex critical thinking, no active supervisory duties, and no positions requiring primary decision making capacities.' Although certainly relevant, Dr. Nelson's opinion does not change the Court's assessment that Mr. Johnson has failed to demonstrate by

2928459

a preponderance of evidence that he is disabled within the meaning of the Policy.

At the outset, it is important to note that Dr. Nelson points to no test results that support a prohibition on critical thinking and decision-making. Nor does he point to any specifics in his treatment history of observations of Mr. Johnson that would support such a restrictions. Instead, it appears that he includes the suggested limitations on intellectually challenging work because Mr. Johnson has reported himself as unable to perform such tasks. The Court finds the absence of support in Dr. Nelson's opinion weakens its persuasive force.

Id. at *8-9.

Fourth and finally, Plaintiff has failed to meet his evidentiary burden because "[t]he record also contains several medical opinions that contradict and, therefore, weigh against [Dr. Vercellotti's] statement." Id. at *9 (citing Leahy v. Raytheon Co., 315 F.3d 11, 21 (1st Cir. 2002): "When other evidence sufficiently contradicts the view of a treating physician, that view may be appropriately rejected."). Based on their thorough and documented review of Plaintiff's records (including summaries of his medical history), Drs. Nosaka, Dean and Greenstein all noted the lack of objective medical support for Dr. Vercellotti's opinion that Plaintiff's symptoms precluded him from full-time work and, conversely, the objective medical evidence of remission and stability; Plaintiff's own statements that his symptoms were being managed and improving; the incongruence between the symptoms being disabling and the conservative level, or lack, of treatment for the reported symptoms; and the discrepancy between Plaintiff's activities and the reported symptoms being severe. As in Johnson, the reports and opinions of Unum's medical reviewers evidence a thorough investigation and "weigh against a conclusion that [Plaintiff] has carried his burden to show that he was disabled under the Policy." Id. at *9-10.

27

2928459

Given the lack of objective evidence supporting restrictions and limitations on Plaintiff's ability to perform full-time work in his regular occupation as of December 10, 202 and, conversely, the great weight of objective evidence supporting no ongoing disability from full-time work as of this date; and the incongruence between the reported severity of Plaintiff's symptoms and his level of treatment and activity, this Court should determine that Plaintiff failed to meet his burden and that Unum's decision to discontinue benefits was correct. Accordingly, judgment on the Administrative Record should be entered in Unum's favor and this action dismissed with prejudice.

## II.     PLAINTIFF MISCALCULATES THE MONTHLY BENEFIT AMOUNT POTENTIALLY PAYABLE.

Should the Court determine that benefits are payable after December 10, 2020, it will also need to determine the correct amount of benefits payable.[2]  This determination is complicated by, as noted above, Plaintiff's return to part time work and receipt of earnings after his alleged date of disability.  The benefit analysis starts with determining Plaintiff's pre-disability basic monthly earnings ("BME").  BME is defined in the Policy as "the insured's average monthly earnings" as figured: (a) from the W-2 form (from the box which reflects wages, tips and other compensation) received from the employer for the calendar year just prior to the date disability begins; or (b) for the period of employment if no W-2 form was received.

---

[2] This determination could be done in the context of these cross-motions or, alternatively, after the Court renders its decision on the merits.

2928459

Here, Box 1 of Plaintiff's 2018 W-2 identified $125,077.95. AR-000163. Unum subtracted Plaintiff's January 2018 part-time earnings and divided the amount by 11 months, resulting in a BME of $10,701.12. AR-000225; 000230. This amount includes Plaintiff's receipt of a bonus of $6,250 for 2018. AR-001262; 001256.

The monthly disability benefit is "the lesser of: (a) 60% of the insured's [BME]; or (b) the amount of the maximum monthly benefit shown in the policy specifications; and (2) deduct other income benefits, shown below, from this amount. Here, the basic monthly benefit is $6,420.67. However, "if the insured is earning more than 20% of his indexed pre-disability earnings in his regular occupation or another occupation, then the monthly benefit will be determined as follows:

> (1) During the first 12 months, the monthly benefit will not be reduced by any earnings until the gross monthly benefit plus the insured's earnings exceed 100% of his **indexed pre-disability earnings**. The monthly benefit will then be reduced by the excess amount.

> (2) After 12 months, the following formula will be used to figure the monthly benefit:

> (A)         The insured's "**indexed pre-disability earnings**" minus the insured's monthly earnings received while he is disabled

DIVIDED BY

> (B)         the insured's "**indexed pre-disability earnings**"

MULTIPLIED BY

> (C)         the benefit as figured above (not including COLA adjustments)

2928459

AR-001334-001335 (Emphasis added). "Indexed pre-disability earnings" is defined as "the insured's basic monthly earning in effect just prior to the date his disability began adjusted on the first anniversary of benefit payments and each following anniversary." AR-001330.

Unum paid benefits from May 2, 2019 through December 10, 2020. At various points before and after the litigation commenced, Unum received information verifying Plaintiff's receipt of ongoing compensation from his employer. This also included his receipt of bonuses. In determining the amount of post disability benefits payable, Unum reduces the basic monthly benefit by the amount of earnings received by an insured and averages bonuses over the entire year in which they are received. This methodology mirrors how Unum determines BME, i.e., Box 1 of annual W-2 forms –which is the benchmark in determining the monthly disability benefit amount payable. This construction is reasonable as bonuses are earned over the period an individual works.

For his part, Plaintiff will assert his receipt of bonuses should not be considered "monthly earnings" and, even if properly applied to reduce his potential monthly benefit, the bonus amount should only be considered in the month it was received, i.e., generally December, rather than averaging the amount over the preceding calendar year. This application would reduce the monthly disability benefit payable in December of each year to zero, but significantly increase the monthly benefit payments in the other eleven months of the year.

This construction is unreasonable. It allows Plaintiff to obtain the benefit of a larger monthly disability payment – by virtue of the bonus inclusion in the BME calculation – but then assert that the post disability benefit amount should not be reduced by his receipt of

the same bonus. Plaintiff's construction would also promote mischaracterizing compensation or the timing of receipt of earnings so to avoid inclusion in post disability earnings. For example, an insured could instruct his employer to pay his compensation quarterly, despite providing services on a monthly basis. Under Plaintiff's construction, the insurer would only be permitted to consider the earnings over four months payments were received, rather than the full twelve months the insured worked..

In addition, at least one court has rejected Plaintiff's construction of a similar provision. In Neumiller v. Hartford Life Ins. Co., the LTD policy similarly provided that an insured's post disability "monthly earnings" would reduce or potentially terminate ongoing benefit payments. WL 4173022, *1 (9th Cir. June 26, 2023). The insured received "Trimester Bonuses" which she argued should not be considered "monthly earnings" so as to reduce post disability benefit payments, and that, even if they were properly considered (and contrary to Plaintiff's argument here), the payments should not be applied in the single month they were distributed. Id.

The district court rejected both of the insured's arguments and she appealed. The Ninth Circuit Court of Appeals affirmed the district court on treating the bonuses as monthly earnings, but reversed the district court on applying the bonus in the month it was received. The court reasoned: "[t]reating 'monthly' bonuses as amounts that an employee accrues in a given month is more consistent with Hartford's practice of treating Neumiller's 'monthly' wages as the compensation that she accrues by working in a given month, even when some portion of her monthly wages is not distributed until the next month's paycheck. This interpretation is also more consistent with the way that the policy treats

31

2928459

bonuses for purposes of calculating 'Pre-Disability Earnings.' There, the policy averages bonuses across 24 months instead of counting all bonuses toward the month in which they are distributed." Id. at *2.

The court's reasoning in Neumiller applies in this case. Plaintiff's annual bonus should similarly be applied over the entire year it was earned, consistent with how BME is determined.

## CONCLUSION

Based on the foregoing, the Court should grant Unum's Motion for Judgment on the Administrative Record and dismiss Plaintiff's Complaint with prejudice. To the extent the Court grants Plaintiff's cross-motion and determines benefits are payable for the period beginning December 11, 2020, it should adopt Unum's methodology toward bonuses as set forth in Section II above.

**MESSERLI & KRAMER, P.A.**

Dated: February 29, 2024        By:    /s/ *Terrance J. Wagener*
                                       Terrance J. Wagener (213676)
                                       Jacob W. Elrich (399470)
                                       1400 Fifth Street Towers
                                       100 South Fifth Street
                                       Minneapolis, MN 55402-1217
                                       Telephone: (612) 672-3600
                                       twagener@messerlikramer.com
                                       jelrich@messerlikramer.com

**ATTORNEYS FOR DEFENDANT**

2928459