**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

MARK W. HARDY,

                           Civil No. 23-563 (JRT/JFD)

              Plaintiff,

v.

                         **MEMORANDUM OPINION AND ORDER**

UNUM LIFE INSURANCE COMPANY OF      **ON CROSS MOTIONS FOR JUDGMENT**
AMERICA,                           **ON THE ADMINISTRATIVE RECORD**

              Defendant.

---

Denise Yegge Tataryn, **NOLAN THOMPSON LEIGHTON & TATARYN PLC**, 1011 First Street South, Suite 410, Hopkins, MN 55343, for Plaintiff.

Jake Elrich and Terrance J. Wagener, **MESSERLI & KRAMER P.A.**, 100 South Fifth Street, Suite 1400, Minneapolis, MN 55402, for Defendant.

Mark W. Hardy brings this action against Defendant Unum Life Insurance Company of America ("Unum") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* He alleges that Unum improperly terminated his employer-provided long-term disability benefits after he was diagnosed with and received treatment for multiple myeloma, an incurable cancer. The parties filed cross Motions for Judgment on the Administrative Record pursuant to Federal Rules of Civil Procedure 39(b) and 52(a)(1). Hardy seeks the reinstatement of his disability benefits, and Unum seeks affirmance of its decision to terminate Hardy's benefits.

After carefully considering the entire record and arguments, the credibility of the evidence, and the applicable law, the Court will find that Unum improperly terminated Hardy's long-term disability benefits.  As a result, the Court will grant Hardy's Motion and deny Unum's Motion.  The Court will order Unum to reinstate Hardy's disability benefits retroactively to the date of termination, resume paying Hardy's disability benefits, calculate any owed and future benefits by pro-rating Hardy's annual partner distributions over the entire year in which they were received, and award Hardy reasonable attorney's fees and costs and prejudgment interest.  Before ordering a specific amount of fees or prejudgment interest, however, the Court will require Hardy to file an affidavit outlining fees and costs and will order additional briefing from the parties on prejudgment interest.

## FINDINGS OF FACT[1]

1.      The Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.      To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

---

[1] The parties submitted the administrative record that Unum developed to evaluate Hardy's claim for benefits.  (Decl. Susan Goen, Sealed Ex. A ("AR"), Feb. 29, 2024, Docket No. 28.) Each page is stamped in the bottom right corner with UA-CL-LTD-XXXXXX, with XXXXXX representing the page number.  For clarity, the Court cites to "AR" then the page number when citing the administrative record.  For example, UA-CL-LTD-000104 is (AR 104.).  For pages stamped in the bottom right corner with UA-CL-LTD POLICY-XXXXXX, Docket No. 28-5, the Court cites to "POL" then the page number.  For example, UA-CL-LTD POLICY 000012 is (POL 12.)

**I.     THE PARTIES**

3.      Hardy, a 56-year-old resident of Minnesota, is a partner in the law firm of Geraghty, O'Loughlin & Kenney, P.A., where he has been employed since 2003.  (Compl. ¶¶ 4–5, 20, Mar. 9, 2023, Docket No. 1; AR 1248, 2651.)

4.      Geraghty, O'Loughlin & Kenney, P.A. provides long-term disability benefits to its employees through Unum.  (POL 3.)

5.      Hardy is covered under the long-term disability policy as a partner.  (AR 2650.)

**II.     UNUM'S LONG-TERM DISABILITY POLICY**

6.      Hardy's long-term disability policy ("Policy") defines various terms and explains how to determine whether someone is disabled under the plan.

7.      Under the Policy, a partner is disabled if:

[B]ecause of injury or sickness:

1.      the insured cannot perform each of the material duties of his regular occupation; or

2.      the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

a.      performing at least one of the material duties of his regular occupation on a part-time or full-time basis; and

b.      earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

(POL 12.)

8.     For attorneys, "regular occupation" means "the specialty in the practice of law which the insured was practicing just prior to the date disability started."  (POL 12.)

9.     The Policy does not define "material duties."

10.    Indexed pre-disability earnings are "the insured's basic monthly earnings in effect just prior to the date his disability began adjusted on the first anniversary of benefit payments and each following anniversary."  (POL 10.)

11.    To receive benefits, an insured must provide "proof of continued disability and regular attendance of a physician."  (POL 25.)

12.    The Policy permits Unum to require a clamant to be evaluated by a medical practitioner or a vocational expert of its choosing or to be interviewed by an Unum representative.  (POL 26.)

13.    Unum's Claims Manual, which provides guidance in evaluating a disability claim, explains that disability is to be evaluated on the specific tasks that comprise a claimant's occupation, and not solely on the claimant's ability to perform at a general level of physical work activity.  (AR 2521.)   Additionally, the Claims Manual explains that "[w]hile usage of the DOT physical demands . . . provides a starting point for defining the physical requirements of a specific occupation, they are generally **insufficient** as standalone descriptions."  (AR 2521 (emphasis added).)

14.    Unum's Claims Manual permits subjective symptoms to be considered.  The manual instructs that subjective symptoms are assessed with respect to their sufficiency

to support their existence, intensity, frequency, and duration; their consistency with the underlying diagnoses; and their reported effect on physical, emotional, and cognitive functioning.  (AR 2517–19.)

15.    The amount of the disability benefit is 60 percent of an insured's basic monthly earnings not to exceed the maximum monthly benefit, less other income benefits.  (POL 5.)  The maximum monthly benefit is $10,000.  (POL 5.)

16.    If an insured is working while disabled and earning more than 20 percent of his indexed pre-disability earnings in his regular occupation or another occupation, the monthly benefit will be figured as follows:

> 1.    During the first 12 months, the monthly benefit will not be reduced by any earnings until the gross monthly benefit plus the insured earnings exceed 100% of his indexed pre-disability earnings. The monthly benefit will then be reduced by that excess amount.

> 2.    After 12 months, the following formula will be used to figure the monthly benefit.

> (A divided by B) x C

> A = The insured's "indexed pre-disability earnings" minus the insured's monthly earnings received while he is disabled.

> B = The insured's "indexed pre-disability earnings".

> C = The benefit as figured above, but not including adjustments under the Cost of Living Adjustment provision.

(POL 15.)

17.   The Policy defines "basic monthly earnings" as "the insured's average monthly earnings as figured: (a) from the W-2 form . . . for the calendar year just prior to the date disability begins; or (b) for the period of employment if no W-2 form was received."  (POL 6.)

18.   The Policy does not define "monthly earnings" received while disabled.

19.   Disability benefits are terminated when the claimant is no longer disabled. (POL 17.)

### III.   HARDY'S OCCUPATION

20.   At the time of Hardy's cancer diagnosis, he was a medical malpractice trial attorney.  (AR 2651.)

21.   In September 2020, Unum performed a vocational assessment.  Unum's vocational assessment identified Hardy's occupation as the more specialized occupation of "Attorney Litigation" (as opposed to "Attorney"), consistent with the Policy.  (AR 1046.)

22.   The vocational assessment also included a description of the material and substantial duties of a Litigation Attorney, including interviewing clients and witnesses, taking and defending depositions, attending pre-trial hearings, and preparing for and conducting trials.  (AR 2345–46; *see also* AR 2043.)

23.   Based on the specialized occupation and associated duties, Unum utilized the Dictionary of Occupational Titles ("DOT"), Occupational Outlook Handbook ("OOH"),

and the "enhanced" Dictionary of Occupational Titles ("eDOT") to determine the

following physical and mental/cognitive demands of a Litigation Attorney:[2]

> Physical Demands:
> Sedentary Work: Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 lbs occasionally.
> Constantly: Talking and hearing
> Frequently: Reaching (desk level), handling, fingering and near acuity
> Occasionally: Reaching upward, reaching downward, keyboard use and visual accommodation.
> . . .
> Mental/Cognitive Demands:
> Directing, Controlling, or Planning Activities for Others: Involves accepting responsibility for formulating plans, designs, practices, policies, methods, regulations, and procedures for operations or projects; negotiating with individuals or groups for agreements or contracts; and supervising subordinate workers to implement plans and control activities.
> Making Judgments and Decisions: Involves solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experiences, or quantifiable or factual data.
> Dealing with People: Involves interpersonal relationships in job situation beyond receiving work instructions.
> Performing a Variety of Duties: Involves frequent changes of tasks involving different aptitudes, technologies, procedures, working conditions, physical demands, or degrees of attentiveness without loss of efficiency or composure.

(AR 2042–43.)

---

[2] *Dictionary of Occupational Titles*, Fourth Edition, United States Department of Labor Employment Training Administration (Revised 1991); *Occupational Outlook Handbook*, United States Bureau of Labor Statistics, www.bls.gov/ooh/home.htm; *Enhanced Dictionary of Occupational Titles*, Economic Research Institute, www.erieri.com/occupationalassessor.

IV.    **HARDY'S CANCER DIAGNOSIS, TREATMENT, AND SYMPTOMS**

24.    In October 2016, Hardy fractured his pelvis while running.  (AR 2653, 3504.)

Doctors then discovered a plasmacytoma in his left superior pubic ramus.  (AR 2653,

3504.)

25.    A month later, Hardy fractured his pelvis again.  (AR 2653.)  He underwent

surgery to remove the tumor and started a five-week course of radiation.  (AR 2654.)

26.    In June 2017, Hardy fractured his pelvis a third time, and tests revealed that

the plasmacytoma had spread.  (AR 2654.)  Hardy was diagnosed with multiple myeloma,[3]

an uncurable cancer, and immediately began high-dose triple chemotherapy.  (AR 2654,

2676.)

27.    In September 2017, Hardy underwent an autologous bone marrow

transplant.[4]  (AR 2654.)  After the transplant, initial bone marrow biopsy results suggested

that Hardy's cancer was in stringent complete remission.  (AR 2676.)  Hardy took a leave

of absence to recover from the transplant.  (AR 863.)

28.    Hardy returned to work in January 2018, resuming full-time hours in

February.  (AR 3703.)

_____

[3] Multiple myeloma is a cancer that forms in certain white blood cells called plasma cells.
(AR 2561.)  It causes plasma cells to accumulate in the bone marrow and crowd out healthy blood
cells, which causes bone tumors and produces abnormal proteins that cause other complications
in the body.  (AR 2561.)
    [4] Autologous stem-cell transplantation is "transplantation of stem cells removed from a
patient, and given back to that same patient, for the purpose of growing new marrow after
myeloablation."  (AR 2651.)

29.     Hardy began long-term maintenance chemotherapy with Revlimid, which is a drug with anti-myeloma effects and is standard for post bone marrow transplant multiple myeloma patients.  (AR 2655, 2676.)  Hardy was originally prescribed 10 mg of Revlimid daily.  (AR 2676.)

30.     Common side effects of Revlimid include fatigue, lack of stamina, diarrhea, nausea, and peripheral neuropathy.  (AR 2655, 2676.)

31.     Hardy also started receiving infusions of Zometa to treat his bone damage. (AR 2880, 2955, 2958.)

32.     Hardy struggled due to the sequelae of his treatments, including the side effects of Revlimid, which caused significant fatigue, lack of stamina, pain, very frequent diarrhea, nausea, vomiting, and peripheral neuropathy.  (AR 2656.)

33.     Hardy occasionally took Ativan to mitigate his nausea, received weekly vitamin B12 injections for his neuropathy, and took Imodium for the diarrhea.  (*See, e.g.*, AR 2473, 2590–91, 2661, 2676, 3063, 3638.)

34.     In February 2018, Hardy became an oncology patient of Dr. Gregory M. Vercellotti, M.D.  (AR 2677.)  Dr. Vercellotti is the Section Head of Benign Hematology at the University of Minnesota.  (AR 2598.)

35.     Dr. Vercellotti changed Hardy's Revlimid prescription to 10 mg daily on a 28-day cycle, with 21 days taking the drug followed by 7 days off.  (AR 2676.)  The plan was

to eventually increase the dosage to 15 mg daily, but due to side effects, Hardy was never able to increase the dosage. (AR 2655, 2676.)

36. Hardy had monthly blood tests, which revealed some abnormalities. (*See, e.g.*, AR 2844–45, 2866–72, 2963, 2982–85, 3055.)

37. Hardy reported to Dr. Vercellotti a cyclical pattern where his fatigue increased over the course of the 21 days taking Revlimid and lessened during the 7 days off. (*See, e.g.*, AR 2676, 2981.)

38. Hardy also reported memory issues, lack of stamina, peripheral neuropathy, and pain in his pelvis where he had bone damage and had received radiation therapy, which made it difficult for him to sit for long periods of time. (AR 2981.) He confessed his concerns about his ability to perform as a full-time trial attorney. (AR 2981.) Additionally, Hardy experienced near-daily nausea and ongoing diarrhea. (AR 2676.)

39. Dr. Vercellotti reduced Hardy's Revlimid dosage to 10 mg daily for 14 days on with 14 days off, despite Hardy's concerns that such a reduction could decrease his chance of long-duration remission and survival. (AR 2677, 2981–82.) Dr. Vercellotti noted that he thought "maybe [Hardy] is not able to continue to perform his profession optimally" due to "his morbidity of his chemotherapy and myeloma." (AR 2982.)

40. Medical records document that Hardy's symptoms of fatigue, nausea, chronic pain, loose stools/diarrhea, sleep difficulty, and anxiety continued, and his law

partner, David Hutchinson, suggested that Hardy stop doing trial work.  (AR 2648–49, 3002, 3050, 3063, 3075.)

## V.   APPLICATION AND APPROVAL OF DISABILITY BENEFITS

41.    In February 2019, Hardy reduced his hours to part-time and applied for partial long-term disability benefits through the Policy.  (AR 1248–49.)

42.    Hardy explained that the "[e]ffects of multiple myeloma and side effects of prior treatments and ongoing maintenance chemotherapy" prevented him from performing all of his responsibilities as a full-time trial attorney, especially "handling trials, lengthy depositions, lengthy court appearances, long conferences with clients and expert witnesses, traveling long distances and working long days."  (AR 1249.)

43.    Unum underwent a process to evaluate Hardy's claim.

44.    Dr. Vercellotti certified Hardy's pelvic fractures, multiple myeloma diagnosis, subsequent surgeries and treatments, and vitamin B12 deficiency in an Attending Physician statement.  (AR 1277–79.)  Dr. Vercellotti wrote that Hardy's "significant sequelae," including neuropathy, fatigue, nausea, diarrhea, bone destruction and chronic pain, and lack of stamina, "limit his ability to carry out all of his responsibilities as a trial lawyer and litigator" and thus "limit[] him to light office work on a part-time basis as he feels able to do."  (AR 2678.)  Dr. Vercellotti provided treatment records from December 2018 wherein he opined that Hardy's symptoms were likely due to side effects from Revlimid and his vitamin B12 deficiency.  (AR 1281–82.)

45.     Geraghty, O'Loughlin & Kenney, P.A. confirmed that Hardy was working part-time, and that Hardy's symptoms prevented him from "taking or defending lengthy depositions, trying cases, handling lengthy court hearings, attending lengthy conferences, traveling long distances for work, or being present in the office full time."  (AR 1255–56.)

46.     On a phone call with an Unum representative, Hardy verified that he had not taken on any trials since his disability because he knew "he would not be able to [sustain] the 16 hours back-to-back days needed."  (AR 138–40.)

47.     On May 13, 2019, Unum approved Hardy's claim.  (AR 245–48, 285.)  Unum determined that Hardy's disability began on February 1, 2019, and that his benefits would begin effective May 2, 2019.  (AR 245.)

## VI.     RECERTIFICATION OF DISABILITY BENEFITS

48.     In June 2020, Unum conducted an annual review of Hardy's claim and requested updated information.  (AR 1807–08.)

49.     Hardy reported that he "work[s] several hours a day as a lawyer and partner in a law firm.  When not working, I exercise, do household chores, [and] spend time with my wife and daughter."  (AR 1850.)  He answered "No" to whether his condition prevented him from caring for himself or required assistance with activities of daily living.  (AR 1850.)  Hardy indicated that Dr. Vercellotti was his sole treating provider.  (AR 1851.)

50.     Dr. Vercellotti provided an updated Attending Physician Statement, indicating that Hardy continued to experience neuropathy, fatigue, nausea, diarrhea, chronic pain, and lack of stamina.  (AR 1865.)  He re-certified that Hardy's symptoms

continued to limit his ability to perform all of his responsibilities as a full-time trial lawyer.

(AR 1865–66.)  Dr. Vercellotti attached treatment notes from a remote clinic visit in April

2020, wherein he had noted that Hardy was "doing well," that Hardy had reported some

improvements in his symptoms, that Hardy was exercising regularly, and that his

Karnofsky score was 100,[5] indicating a normal ability to perform daily activities.  (AR

1868–69, 2220.)

     51.    In July 2020, Unum recertified Hardy's benefits.  (AR 675–76.)

## VII.  UNUM'S REINVESTIGATION AND TERMINATION OF BENEFITS

     52.    Weeks after recertification, Unum documented that Hardy's "[c]apacity for

full time is unclear" and initiated a reinvestigation of his claim.  (AR 723–25.)

     53.    Unum requested clarification from Dr. Vercellotti regarding Hardy's ability

to perform the demands of his occupation on a full-time basis.  (AR 2075.)  Vercellotti

repeated his diagnosis of multiple myeloma and indicated that Hardy's symptoms

continue to limit him to part-time work as a trial lawyer.  (AR 2076.)

     54.    Dr. Vercellotti's treatment notes from a virtual clinic visit in October 2020

indicated that Hardy was "doing well," that his multiple myeloma was in remission, that

his Karnofsky score was 100, and that Hardy thought that his neuropathy had improved

from the vitamin B12 injections.  (AR 2231–36, 2679.)  The radiographic bone survey and

---

[5] The Karnofsky Performance Status is a standard way of measuring the ability of cancer patients to perform ordinary tasks.

PET/CT scans showed "Stable postoperative changes of curettage and cement packing in the left superior public rami.  No new lytic lesion or compression fracture identified."  (AR 2231.)

55.     On a phone call with an Unum representative, Hardy reported that he biked daily, went outside when possible, hiked, and had a trainer.  (AR 2253.)  He tried to exercise an hour every day.  (AR 2253.)  Hardy believed that the "best thing is exercise" for someone in his position.  (AR 2253.)  When asked about "his biggest barrier to returning to work full-time," Hardy responded that because of his fatigue, neuropathy, and nausea and vomiting, he "cannot return to the rigors and long hours of being a trial attorney."  (AR 2253.)  He reported that he "just can't go back" to working up to 18 hours a day during trial.  (AR 2253–54.)

56.     Dr. Vercellotti's treatment notes from March and October 2019 indicate that Hardy had been skiing and had gone on a 90-mile canoe trek with his wife and daughter.  (AR 987, 2880.)

57.     In November 2020, an Unum clinical consultant determined that Hardy was not precluded from performing the demands of his job on a full-time basis, as his treatment notes indicated that he had been doing well over the last year, that some of his symptoms had improved, and that he had been "exercising regularly."  (AR 2260.)  The reviewer concluded that "[t]he absence of disease and this level of activity is inconsistent with an inability for seated tasks with the ability for positional changes."  (AR 2260.)

-14-

58.     Hardy's information was then referred to Unum's reviewing operations physician, Dr. Robert Nosaka, who is board certified in internal medicine.  (AR 2287–95.) Dr. Nosaka was advised that Hardy's occupation was "Attorney Litigation" and was provided the physical and mental/cognitive demands of a Litigation Attorney.  (AR 2295.)

59.     Dr. Nosaka reviewed Hardy's medical and vocational records and concluded that Hardy was not precluded from performing the material duties of his regular occupation on a full-time basis.  (AR 2292–93.)  He noted Hardy's remission status, that his most recent physical examinations were normal, that Hardy reported feeling "pretty good" with no signs of acute distress, his normal lab results, and his Karnofsky score of 100.  (AR 2293.)  He also noted that despite Hardy's "complaints of significant pain," "[t]here have been no referrals to specialists such as Gastroenterology or Neurology," and Hardy's medications were "minimal."  (AR 2293.)  Dr. Nosaka also documented Hardy's biking, skiing, travelling, and 90-mile canoe trek, and concluded that Hardy's "level of activity is inconsistent with an inability to perform his occupation full time which is performed at a sedentary level of physical demand."  (AR 2293.)

60.     Because Dr. Nosaka reached a different conclusion than Dr. Vercellotti regarding Hardy's functional capacity, he recommended additional medical review.  (AR 2295.)

61.     Unum then referred Hardy's claim to its designated medical officer,  Dr. Herbert Dean, who is board certified in oncology, hematology, and internal medicine.  (AR

2299–301.)  Dr. Dean was advised that Hardy's occupation was "Attorney Litigation" and was provided with the physical and mental/cognitive demands of a Litigation Attorney. (AR 2297–99.)

62.    Dr. Dean reviewed the medical records, including Dr. Vercellotti's and Dr. Nosaka's reviews and other documents in Hardy's file.  (AR 2300.)

63.    Based on his review, Dr. Dean concluded that Dr. Vercellotti's opinion was not supported by medically acceptable clinical or laboratory diagnostic techniques or other evidence in the claim file.  (AR 2301.)  Like Dr. Nosaka, Dr. Dean concluded that Hardy was not precluded from performing the material duties of his occupation full-time. (AR 2301.)  He noted Hardy's remission status, lab and imaging results, and regular exercise, and opined that Hardy was "tolerating" his maintenance Remlivid therapy and had no restrictions or limitations.  (AR 2301.)

64.    On November 30, 2020, Unum requested a copy of Hardy's job description from his employer.  (AR 2323.)  The firm provided a description of Hardy's pre-diagnosis duties and stated that Hardy has not performed any trials or other lengthy or arduous tasks since February 2019.  (AR 1141–43.)

65.    Dr. Nosaka also contacted Dr. Vercellotti to clarify Hardy's limitations.  (AR 2334–36.)  Dr. Vercellotti indicated that Hardy "makes it very clear to me that he cannot spent [sic] 8 hours in the office thinking clearly about depositions or having the ability to provide his clients with optimal attention" because he "develops mental fogginess and

-16-

fatigue." (AR 2337.)  Dr. Vercellotti wrote that despite Hardy's regular exercise, "the collateral damage has been primarily the peripheral neuropathy, the effects of the radiation and the lesion of his left pubic ramus," and such symptoms make it difficult for Hardy to assume his responsibilities over an 8-hour day.  (AR 2337.)  In Dr. Vercellotti's opinion, Hardy should work "an approximately 5-1/2 hour day occasionally and frequently might need a 3-1/2 to 5-1/2 hour day," though he "certainly is not fully disabled."  (AR 2337.)

66.    In December 2020, Dr. Nosaka conducted a medical re-review of Hardy's claim based on the additional medical and occupational information.  (AR 2354.)

67.    Dr. Nosaka again opined that the restrictions and limitations imposed by Dr. Vercellotti were unsupported, and that the additional occupational information did not alter his prior opinion.  (AR 2356–57.)  Specifically, Dr. Nosaka reasoned:

> [T]here has been sufficient time to recover from adverse side effects and to acclimate to previous and current treatment. The insured has been able to perform the duties of his occupation part-time, which is performed at sedentary level of physical demand, for more than year to allow for work hardening.  Additionally, as the records indicate, he has been able to engage in extensive activities for leisure and exercise. Thus, given the progression of time, the work hardening, the minimal physical demands of the occupation, and the level of activity, OSP opines that the insured is not precluded from performing the full-time duties of the occupation.

(AR 2356.)  Dr. Nosaka wrote that the additional occupational duties did not alter his prior opinion that the medical evidence does not support that Hardy was precluded from performing the material duties of his occupation on a full-time basis.  (AR 2357.)

68.     Given the continued disagreement between Dr. Vercellotti and Dr. Nosaka, as well as the additional occupational information provided by Hardy's firm, Unum also requested that Dr. Dean re-review Hardy's claim.  (AR 2358.)

69.     Dr. Dean's prior opinion was not altered by the additional occupational information or by Dr. Vercellotti's most recent letter.  (AR 2361.)

70.     On December 10, 2020, Unum terminated Hardy's benefits.  (AR 2377–80.)

71.     In its termination letter, Unum outlined Dr. Nosaka's review of Hardy's claim and medical records and his ultimate conclusion that there was "no support for restrictions that would prevent [Hardy] from the full-time activities required in [his] occupational duties," especially given his normal physical exams, Karnofsky score of 100, lack of significant findings like distress, weight loss, cognitive deficiency, or abnormal musculoskeletal findings, and improvements of symptoms due to vitamin B12 injections and other medications.  (AR 2379.)  In addition, Unum explained Dr. Nosaka's observations that "[t]here have been no referrals to specialists such as gastroenterology or neurology," that Hardy's use of medications had been "minimal," and that Hardy had engaged in physical exercise to an extent that was "inconsistent with an ability to perform

[his] occupation full-time which is performed at a sedentary level of physical demand."

(AR 2379.)  Unum also pointed to Dr. Dean's similar conclusions.  (AR 2380.)

## VIII.   HARDY'S APPEAL OF UNUM'S DECISION

72.     Hardy administratively appealed Unum's decision on February 11, 2022.

(AR 2447–63.)

73.     The appeal letter challenged Unum's medical reviewers' opinions and

Unum's vocational assessment of the physical and mental demands of Hardy's

occupation.  (AR 2453–59.)

74.     Hardy also included a new letter from Dr. Vercellotti along with Dr.

Vercellotti's 50-page curriculum vitae; declarations from Hardy and his spouse, Tanya

Snyder; declarations from two of Hardy's colleagues; an Independent Employability

Assessment by Ken Askew; medical literature; and medical records from October 2016 to

the date of the appeal.  (AR 2459–63.)

75.     In his appeal letter, Dr. Vercellotti described his treatment of Hardy since

2017 and the symptoms Hardy reported during and after such treatment.  (AR 2675–80.)

He described a remote clinic visit in April 2021, wherein Hardy reported fatigue, lack of

stamina, especially during the third week of his Revlimid cycle, and diarrhea 5 out of 7

days a week.  (AR 2679.)  In his treatment notes, Dr. Vercellotti documented that Hardy's

pelvic pain "limits how long he can sit in an office chair without getting up to stretch and

requires him, for example, to use his arms and hands to lift his left leg when he gets into

or out of his car." (AR 2679–80.) He also wrote that Hardy was experiencing neuropathy in the toes and fingers, which made typing and writing difficult. (AR 2680.)

76.    Dr. Vercellotti opined that Hardy's symptoms continued to preclude him from performing all material duties of his job, which "require long periods of focus and concentration, quick processing of new information, and that he be able to think quickly on his feet." (AR 2677.) He explained that Hardy's regular exercise, skiing, and 90-mile trek did not change his opinion regarding Hardy's functionality because "regular exercise and maintaining fitness are often effective ways to address and partially mitigate multiple myeloma treatment-related fatigue and lack of stamina." (AR 2678.) "Whether Mr. Hardy is able to occasionally ski has little bearing on whether he is able to perform his former duties as a full-time litigator and trial attorney." (AR 2678.)

77.    In Hardy's declaration, he provided his medical history and claim history as well as a detailed explanation of his restrictions and limitations. (AR 2650–69.) Specifically, Hardy explained that fatigue and lack of stamina, "when combined with long hours of intense focus and concentration, lead to lapses of focus and concentration, mental fog, and resulting memory gaps," and that part-time work allowed him to manage these symptoms because he was able to routinely sleep eight to nine hours a night and incorporate exercise into his daily routine. (AR 2660.) Additionally, Hardy wrote that during the 21-day Revlimid cycle, his near-daily nausea, and persistent, watery diarrhea would be "difficult to manage during trial, lengthy court appearances, or long days of

depositions or meetings with clients and experts." (AR 2661.) To mitigate these symptoms, Hardy avoided eating until later in the day, took Zofran (anti-nausea medication), sometimes took Ativan, and took over-the-counter Imodium (for diarrhea). (AR 2661.) Chronic pain in his pelvis would grow from "minor at the start of a prolonged period of sitting" to "significant to the point of distraction over long periods of time sitting without breaks to stand and walk." (AR 2661.) Hardy mitigated this pain by eliminating lengthy periods of sitting. (AR 2661.) Finally, Hardy's peripheral neuropathy caused numbness and tingling in his fingertips and toes. (AR 2661.) The neuropathy had improved with vitamin B12 treatments, but "remain[ed] a constant and consistent side effect" that slowed Hardy's typing and made it less accurate, slowed his note-taking abilities, and deteriorated the quality of his handwriting. (AR 2661.)

78.     Tanya Snyder's declaration provided her observations of Hardy's difficulties, opining that the reason Hardy was doing so well was "largely because he is working in a limited capacity." (AR 2673–74 (emphasis omitted).)

79.     In another declaration, David Hutchinson, Hardy's law partner, described his observations of Hardy's symptoms and limitations, writing that Hardy "is no longer physically capable of trying cases, including as a second chair lawyer." (AR 2649.)

80.     Robert Mahoney, another law partner, detailed the professional duties of a trial lawyer, including 18-hour trial days and the need to maintain focus and readiness for long periods of time. (AR 2671–72.)

81.     The new evidence also included an Independent Employability Assessment by Ken Askew, a vocational expert.  (AR 2587–97.)  In October 2021, Askew determined that Hardy's part-time schedule was Hardy's maximum vocational capacity.  (AR 2596–97.)  During his 2-1/2-hour interview with Hardy, Askew observed that Hardy's energy level, rate of speech, and overall demeanor diminished.  (AR 2596.)  He opined that the occupational information from Hardy's employer was more reliable than the information contained in the DOT and OOH, although he acknowledged they are reliable sources of data.  (AR 2592, 2597.)

## IX.   UNUM'S REVIEW AND DENIAL OF APPEAL

82.     Unum provided the information and documentation on appeal for independent vocational and medical reviews.

83.     The vocational reviewer noted that Hardy "has consistently provided his job title as Trial Attorney and Litigation Attorney.  The employer has provided similar information.  Therefore, Litigation Attorney as described would meet the specialty definition as it differs from Attorney."  (AR 3609.)  She concluded that the DOT, OOH, and eDOT descriptions of the occupational duties and demands of Litigation Attorney spoke to Hardy's actual duties and demands as provided by his employer.  (AR 3609–10.)  The vocational reviewer also noted that Hardy's "trial work, depositions, research and time with clients is included in the description of duties of the occupation of Attorney Litigation.  Travel is included as is working over 40 hours per week."  (AR 3610.)

-22-

84.     On appeal, Unum requested a medical review from Dr. Neal Greenstein, who is board certified in internal medicine.  (AR 3620–22.)

85.     Dr. Greenstein was asked to opine whether the medical evidence supported restrictions and limitations that would have precluded Hardy from performing each of his occupational demands after December 10, 2020.  (AR 3620.)  The file evidence provided to Dr. Greenstein included the physical and mental/cognitive demands of Attorney Litigation as well as a copy of Ken Askew's Independent Employability Assessment.  (AR 3617, 3620–22.)

86.     Dr. Greenstein concluded that the medical information in the record was inconsistent and insufficient to support Hardy's claim.  (AR 3620.)  He noted that Hardy was in remission, that he was "seen virtually at low-intensity 6-month intervals by Dr. Vercellotti" for two years, that he self-reported during those visits that he was "feeling pretty good," that his neuropathy was improving on vitamin B12, that he was regularly exercising, and that his Karnofsky score was 100.  (AR 3620.)

87.     Dr. Greenstein thus concluded that Hardy was not disabled as of December 10, 2020, reasoning that:

> [T]he existence, intensity, frequency, and duration of the claimant's reported symptoms, including but not limited to fatigue, pelvic pain, cannot sit too long and needs to get up to stretch, nausea with a loss of appetite, tingling and numbness in fingers and toes, and difficulty typing and writing is not consistent with a physical exam, diagnostic findings, treatment intensity, and reported activities.  I acknowledge the claimant's reported symptoms, the various letters, and

the 11/2021 employability assessment.  However, it should be noted there was no in-person visits, the documented virtual exams, including a Karnofsky score of 100, and diagnostics were clinically unremarkable."

(AR 3621.)

88.     On May 4, 2022, Unum upheld its termination of Hardy's benefits.  (AR 3677–83.)

## X.     OTHER FINDINGS OF FACT

89.     The Court takes judicial notice that the height of the COVID-19 pandemic was in the years 2020 and 2021.[6]  Fed. R. Evid. 201(c)(1).

90.     The Court did not find evidence that Dr. Vercellotti, the only provider who personally examined Hardy, believed that Hardy was unreliably reporting his symptoms, that his self-reported symptoms lacked credibility, or that Hardy was engaging in symptom magnification.

91.     Unum never required Hardy to submit to an independent medical evaluation, despite the Policy allowing so.  (POL 26.)

---

[6] Meredith S. Shiels, *COVID-19 Was Third Leading Cause of Death in the United States in Both 2020 and 2021*, National Institutes of Health (July 5, 2022), https://www.nih.gov/news-events/news-releases/covid-19-was-third-leading-cause-death-united-states-both-2020-2021; *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (recognizing authority to take judicial notice of government websites); *e.g.*, *In re RFC and ResCap Liquidating Tr. Action*, 444 F. Supp. 3d 967, 969 & n.1 (D. Minn. 2020) (taking judicial notice of COVID-19 data from the CDC).

92.     Based on the Administrative Record, no medical professional who personally examined Hardy cleared him to work full-time.

93.     Unum did not present any evidence contradicting Hardy's symptoms.

## XI.   PROCEDURAL HISTORY

94.     After Unum denied Hardy's appeal, Hardy filed this ERISA action.  (Compl.)

95.     The parties filed cross Motions for Judgment on the Administrative Record. (Def.'s Mot. J. on Admin. Record, Feb. 29, 2024, Docket No. 25; Pl.'s Mot. J. on Admin. Record, Feb. 29, 2024, Docket No. 31.)

96.     Unum filed the Administrative Record as a sealed exhibit on which both parties rely.  (Decl. Susan Goen, Sealed Ex. A ("AR"), Feb. 29, 2024, Docket No. 28.)

97.     The Court held a hearing on the Motions on July 9, 2024.  (*See* Minute Entry, July 9, 2024, Docket No. 52.)

## CONCLUSIONS OF LAW

## I.   STANDARD OF REVIEW

1.     ERISA allows a participant in an ERISA-regulated plan to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

2.     The Court reviews plan determinations *de novo* unless the plan grants discretionary authority to the plan administrator.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *accord Johnson v. U.S. Bancorp Broad-Based Change In Control*

*Severance Pay Program*, 424 F.3d 734, 738 (8th Cir. 2005).  As the parties agree, the Policy does not give Unum discretionary authority, so the Court reviews Unum's determination *de novo*.  (Def.'s Mem. Supp. Mot. J. on Admin. R. ("Def.'s Mem.") at 20, Feb. 29, 2024, Docket No. 27; Pl.'s Mem. Supp. Mot. J. on Admin. R. ("Pl.'s Mem.") at 18, Feb. 29, 2024, Docket No. 33.)  As such, the Court gives no deference to Unum's decision.  *See Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992).  This applies to both issues of plan interpretation and fact-based determinations.  *Riedl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 756 (8th Cir. 2001).

3.     Hardy bears the burden of proving by a preponderance of the evidence that he is entitled to the reinstatement of long-term disability benefits past December 10, 2020, within the meaning of the Policy.  *See Farley v. Benefit Tr. Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992).

4.     Because the parties specifically ask the Court to exercise its factfinding function under Federal Rules of Civil Procedure 39(b) and 52(a)(1) to decide the case on the administrative record, the Court acts as a factfinder and may resolve factual disputes, make credibility determinations, and weigh the evidence.  *See Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1026 (8th Cir. 2021); *Chapman v. Unum Life Ins. Co. of Am.*, 555 F. Supp. 3d 713, 716 (D. Minn. 2021).

II.   **RECORD EVIDENCE**

5.   It is undisputed that the Court may rely on the administrative record Unum

filed with the Court.  *Avenoso*, 19 F.4th at 1025; (*see also* Def.'s Mem. at 20; Pl.'s Mem.

at 18.)

III.   **ANALYSIS**

A.   **Disability Determination[7]**

6.   Unum determined that Hardy was no longer disabled as of December 10,

2020, and Hardy challenges this determination.  The Court must thus determine whether

Hardy was disabled as of that date, not whether he remained disabled beyond that time.

7.   When reviewing an ERISA plan administrator's decision *de novo*, the Court

begins by examining the language of the plan documents.  *Kitterman v. Coventry Health*

_____

[7] The Court will not consider the two matters that involve alleged procedural defects in
Unum's claim administration and a 2004 Regulatory Settlement Agreement ("RSA") that Unum
entered with the U.S. Department of Labor and the insurance commissioners of various states.
(*See* AR 2528–48.)  Hardy argues that Unum failed to follow the RSA in its administration of
Hardy's claim, such that the Court's review is augmented by the agreement.  *See Dwyer v. Unum
Life Ins. Co. of Am.*, 548 F.Supp.3d 468, 472 (E.D. Pa. 2021) (determining that court's review was
augmented by RSA).  The RSA provides requirements for Unum's handing of claims, including that
Unum must give "significant weight" to an attending physician's opinion and provide specific
reasons when rejecting it.  (AR 2508.) However, the Court gives no deference to Unum's decision-
making process in its *de novo* review, *Davidson*, 953 F.2d at 1095, so whether or not Unum
complied with an agreement that was entered before Hardy filed his claim is irrelevant.  *See
Goldberg v. Unum Life Ins. Co. of Am.*, 527 F. Supp. 2d 164, 170 (D. Me. 2007) (discussing what
appears to be the same RSA entered into by Unum and explaining that the RSA "simply provided
a process whereby certain claimants could have their claims for benefits under their policies
reassessed").  Additionally, courts have declined to consider dated references to unfair claims
practices when determining the propriety of a benefits decision.  *See, e.g.*, *Jones v. Unum
Provident Corp.*, 596 F.3d 433, 438 (8th Cir. 2010).  The Court will do the same here.

*Care of Iowa, Inc.*, 632 F.3d 445, 448 (8th Cir. 2011).  The Court interprets the terms of the plan documents "by giving the language its common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean" and by reading each provision consistently with the plan as an integrated whole.  *Id.* (quoting *Adams v. Cont'l Cas. Co.*, 364 F.3d 952, 954 (8th Cir. 2004)).

8.     Under the Policy, a claimant is disabled if he is limited from performing each of the material duties of his regular occupation because of an injury or sickness.  Thus, when making a disability determination, the Court must look at the combination of all limitations caused by the injury or sickness.

9.     After carefully reviewing the entire record, the Court finds that the preponderance of the evidence demonstrates that Hardy remained disabled as of December 10, 2020, based on a combination of the effects of multiple myeloma and side effects of his prior treatments and ongoing Revlimid maintenance therapy.

10.     When Unum approved Hardy's application for benefits, it based its decision on the effects of Hardy's multiple myeloma diagnosis and side effects of his prior treatments and ongoing Revlimid maintenance therapy, as documented by Dr. Vercellotti. Unum had initially agreed with Dr. Vercellotti that Hardy's symptoms limited his ability to perform each of his material duties as a medical malpractice trial attorney on a full-time basis.  Then, on December 10, 2020, Unum determined that Hardy was no longer disabled.

Unum based its termination decision on Dr. Nosaka and Dr. Dean's opinions that Hardy no longer had any restrictions or limitations that prevented him from performing the material duties of his regular occupation full-time.  However, Hardy had continued to provide evidence that his symptoms were disabling and limited his ability to work as a full-time trial attorney.  Indeed, he provided evidence that he could not work 16- to 18-hour trial days or sustain attention for long periods of time.

11.     As an initial matter, the parties dispute whether Hardy's regular occupation is "Attorney Litigation," as Unum determined, or "medical malpractice trial attorney," as Hardy argues.  The Policy defines "regular occupation" for attorneys as "the specialty in the practice of law which the insured was practicing just prior to the date disability started."  (POL 12.)  Therefore, Hardy's "regular occupation" is the specialized occupation of medical malpractice trial attorney.

12.     Even though there is overlap between the duties and demands identified by the DOT, OOH, and eDOT for "Attorney Litigation" and Hardy's actual duties and demands as supplied by his employer, the generic duties and demands supplied by the DOT, OOH, and eDOT do not adequately encapsulate those required of Hardy's regular occupation as a medical malpractice trial attorney.  In particular, the generic descriptions do not fully encompass the mental and cognitive demands required of a medical malpractice trial attorney, whose work can involve long trial days and significant emotional toil while representing injured clients.  The Court does not question the reliability of the DOT, OOH,

and eDOT as resources.  *See Darvell v. Life Ins. Co. of N. Am.*, 597 F.3d 929, 935–36 (8th Cir. 2010) (relying on the DOT's occupation description).  But there is no doubt that the duties and demands of a medical malpractice trial attorney are more specialized than those of a generic litigation attorney.  Such duties and demands are vastly distinct from those of, for example, an estate attorney, even though the generic descriptions of "Attorney Litigation" could apply to both types of attorneys.

13.     Hardy's occupation required him to be able to conduct trials and to sustain attention for long periods of time in his other work, such as during interviews and depositions with clients and witnesses.  And because the Policy requires that an attorney's specialty be considered in its definition of "regular occupation," Unum failed to adequately consider Hardy's functionality through the lens of his occupation as a medical malpractice trial attorney.  *See, e.g.*, *Doe v. Standard Ins. Co.*, 852 F.3d 118, 123–24 (1st Cir. 2017) (relying on DOT's generic description of "lawyer" rather than claimant's specialized job description as an environmental lawyer was arbitrary and capricious); *Rahman v. Paul Revere Life Ins. Co., Inc.*, 684 F. Supp. 192, 195 (N.D. Ill. 1988) (concluding that claimant's regular occupation was the emergency cardiology specialty he engaged in prior to his accident, and not that of a general cardiologist).  Even Unum's Claims Manual instructs that a disability should be evaluated by the specific tasks of a claimant's occupation and that, while the DOT descriptions may provide a starting point for defining the demands of a specific occupation, they are generally insufficient on their own.  It is

therefore irrelevant to the Court's disability determination whether Hardy was able to perform the material duties of a general litigation attorney; the question is whether Hardy was able to perform all the material duties of a medical malpractice trial attorney as of December 10, 2020.

14. Having settled the regular occupation matter, the Court now turns to whether sufficient evidence supports a finding that Hardy's symptoms were disabling. It is clear from Dr. Vercellotti's treatment notes that Hardy consistently reported the same symptoms of fatigue, lack of stamina, pain, diarrhea, nausea, vomiting, and peripheral neuropathy between the time that he applied for disability benefits and the termination of his benefits.

15. Unum challenges the credibility of Hardy's reported symptoms given the lack of "objective evidence," such as tests and lab results, to corroborate them. It is undisputed that subjective symptoms are permitted under the Policy but must be corroborated with additional evidence. (*See* AR 2517–18.) Dr. Vercellotti opined that Hardy's symptoms "cannot be measured objectively through clinical or laboratory diagnostic techniques." (AR 3638.) And courts have found that in such circumstances the lack of objective evidence is not definitive. *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006) (noting there may be cases where "objective evidence simply cannot be obtained"); *see also Brigham v. Sun Life of Can.*, 317 F.3d 72, 84 (1st Cir. 2003) ("We fully recognize that laboratory tests or similar diagnostic procedures will not always be

-31-

necessary to substantiate a claim of disability, as certain disabling conditions are not susceptible to such objective evaluations.").   At any rate, Hardy's medical history of plasmacytoma, multiple myeloma, pelvic fractures, and bone marrow transplant support his symptoms, and the record indicates that Hardy did have some abnormal lab results, such as low white blood counts and vitamin B12 deficiency.   And crucially, nothing in the record shows that Dr. Vercellotti—the only provider who personally examined Hardy— questioned these symptoms or found that they lacked credibility.   *See Avenoso*, 19 F.4th at 1027–28.   Dr. Vercellotti is certainly better positioned to evaluate whether Hardy's subjective symptoms were consistent with his observations than Unum's reviewers, who never performed an in-person evaluation.   *See Kaminski v. Unum Life Ins. Co. of Am.*, 517 F. Supp. 3d 825, 862 (D. Minn. 2021).   Plus, Unum itself relied on Hardy's self-reported symptoms when it originally granted benefits and recertified them a year later.   The fact that Unum approved Hardy's claim based on the same reported symptoms it now claims are uncredible cuts against a finding that Hardy's self-reported symptoms lack credibility. *Roehr v. Sun Life Assurance Co. of Can.*, 21 F.4th 519, 526 (8th Cir. 2021) ("[T]his Court has explained that a plan administrator's reliance on the same evidence to both find a disability and later discredit that disability does not amount to a reliance on 'substantial evidence.'").   Finally, Hardy's self-reported symptoms are supported by medical literature, which lists Hardy's symptoms as common side effects of his cancer treatments and surgeries, and are corroborated by his spouse and colleagues, who personally

observed Hardy's restrictions and limitations.   The Court thus finds that sufficient

evidence supports the credibility of Hardy's self-reported symptoms, and the Court will

consider them in its analysis.

16.     The Court next considers whether Hardy's symptoms were disabling to such

a degree that Hardy was unable to perform each of the material duties of his regular

occupation as a medical malpractice trial attorney.   There is mixed evidence on whether

and to what extent Hardy's symptoms had improved by December 10, 2020.   For example,

Dr. Vercellotti's October 2020 treatment notes indicated that Hardy was doing well.   In

particular, he noted that Hardy's multiple myeloma was in remission and that his

Karnofsky score was 100.   In November 2020, Dr. Nosaka noted that Hardy's vitamin B12

treatments had improved his peripheral neuropathy, and Dr. Dean concluded that Hardy

was tolerating his Revlimid.   However, treatment notes from April 2021 indicate that

Hardy's pelvic pain limited how long he was able to sit in an office chair without getting

up to stretch.   And during that time, Hardy continued to report peripheral neuropathy in

his toes and fingers, which made typing and writing difficult.   Ultimately, though some of

Hardy's symptoms may have improved to some extent because of the vitamin B12

injections and other medications, the Court must consider whether **all** of Hardy's

reported symptoms, taken together, were disabling.

17.     The record amply demonstrates that Hardy repeatedly reported a cyclical

pattern where his fatigue increased over the 21 days that he took Revlimid and lessened

during the 7 days off, as reflected in treatment notes from April 2021.  Whether and to what extent Hardy's fatigue and lack of stamina impact his functionality as a full-time medical malpractice trial attorney is disputed, and mixed evidence supports either position.  On the one hand, Dr. Vercellotti repeatedly documented that Hardy's Karnofsky score was 100.  Moreover, Hardy was regularly exercising, had gone skiing, and completed a 90-mile canoe trek.  Common sense calls into question Hardy's functionality to perform a position that involves sedentary work when he was able to perform such a level of physical activity.  Unum's medical reviewers pointed out this discrepancy, which Unum ultimately relied on as a basis for its termination of Hardy's benefits.  But on the other hand, Hardy has never claimed that he could not carry on normal physical activity or exercise.  And the question before the Court is not whether Hardy could perform normal physical activity or exercise as of December 10, 2020, but rather whether he could perform each of his material duties as a medical malpractice trial attorney.  Thus, Hardy's Karnofsky score and his ability to regularly exercise appears to be of little consequence to his basis for disability.   Plus, Hardy's occupation requires more than just physical demands.  It also requires significant mental and cognitive stamina.  Assessing Hardy's fatigue and lack of stamina from a cognitive standpoint, it requires little effort to understand that Hardy struggled to cognitively perform all the material duties of his occupation due to his susceptibility to fatigue, despite his ability to engage in physical activities unrelated to his occupation.

18.     The record also demonstrates that Hardy experienced near-daily nausea and persistent, watery diarrhea during the 21 days that he took Revlimid.  Unum argues there is no evidence that the nausea and diarrhea were disabling, such as documented weight loss, referrals to another provider for such symptoms, or orders for symptom-specific testing and diagnostics.  However,  Dr. Vercellotti opined that Hardy's symptoms were consistent with post bone marrow transplant multiple myeloma patients, which would appear to have negated the need for another provider's opinion to assess the source of such symptoms.  Plus, the record demonstrates that Hardy took steps to mitigate these symptoms because they were severe enough that they interfered with lengthy work tasks.

19.     Finally, Hardy consistently reported chronic pain, particularly in his pelvis where he had bone damage and radiation therapy.  Dr. Vercellotti's treatment notes reflect that Hardy's pelvic pain "limit[ed] how long he can sit in an office chair without getting up to stretch and require[d] him . . . to use his arms and hands to lift his left leg when he gets into and out of his car."  (AR 2679–80.) Unum argues that treatment notes indicate that Hardy presented no acute distress during his appointments, that Hardy was regularly exercising, and that Hardy was not taking pain medication or seeking other treatment options to address the pain.  But Hardy's pain grew from "minor at the start of a prolonged period of sitting" to "significant to the point of distraction over long periods of time sitting without breaks to stand and walk," so the fact that Dr. Vercellotti did not

personally observe such pain during the (presumably short) clinic visits has little bearing on whether Hardy's chronic pain was disabling.  (AR 2661.)  Hardy reported that he mitigated his chronic pain by eliminating lengthy periods of sitting, and some of his material duties require sitting for lengthy periods of time, such as depositions and trial.

20.    Considering all this evidence together, Dr. Vercellotti opined that restrictions and limitations from Hardy's condition prevented him from performing all the material duties of his regular occupation as a medical malpractice trial attorney.  Dr. Vercellotti's opinion is supported by medically acceptable clinical standards and consistent with substantial evidence in the medical records.  Moreover, Dr. Vercellotti has expertise in treating multiple myeloma and has been treating Hardy since 2018.  He is an expert in the field of bone marrow transplants and has been working in the field for over 40 years.  As neither Dr. Nosaka nor Dr. Greenstein specialize in the field of oncology/hematology, Dr. Vercellotti's opinion is entitled to significant weight given that his specialty relates to Hardy's alleged disability.  *See, e.g.*, *Jalowiec v. Aetna Life Ins. Co.*, 155 F. Supp. 3d 915, 942 (D. Minn. 2015).  Additionally, though a treating physician's opinion does "not automatically control," Dr. Vercellotti was the only treating physician in this case and the only medical provider who evaluated Hardy in-person.  *Delta Family-Care Disability and Survivorship Plan v. Marshall*, 258 F.3d 834, 842 (8th Cir. 2001).  None of Unum's medical reviewers evaluated Hardy in person.  Nor did the Court identify evidence in the record indicating that they spoke to Hardy directly when reviewing his

claim.  Unum argues that Dr. Vercellotti's opinions lack weight because Hardy's clinic visits in 2020 and 2021 were conducted remotely, but virtual doctor visits were reasonable given Hardy's immunocompromised state during COVID-19, and Dr. Vercellotti monitored Hardy's condition primarily by reviewing his lab work and x-ray bone surveys.  Given his personal observations, the Court finds that Dr. Vercellotti's opinion is entitled to greater deference than those of Unum's reviewers.  *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 888 (8th Cir. 2002) ("We have held that a treating physician's opinion is generally entitled to greater deference in an ERISA disability case than the opinion of a reviewing physician."); *see also Kaminski*, 517 F. Supp. 3d at 862.

21.     Notably, Dr. Dean does specialize in oncology/hematology.  Yet his opinion is still lacking.  Dr. Dean—as well as Dr. Nosaka and Dr. Greenstein—failed to meaningfully consider the long hours and periods of attention required of a medical malpractice trial lawyer in their evaluation of Hardy's claim.  The reports from Unum's medical reviewers focus on the inconsistency of Hardy's physical activities and his position's sedentary requirements.  As a result, they fail to adequately account for the cognitive toll that Hardy's symptoms had on his functionality.  The Court was unable to identify any meaningful analysis of how Hardy's fatigue and lack of stamina impacted his capacity to resume full-time hours in Dr. Nosaka, Dr. Dean, or Dr. Greenstein's reviews.  None of them sufficiently considered whether Hardy remained capable of preparing for or conducting trials, or whether he could perform lengthy material duties that required sustained

attention for long periods of time.  Further, although the reviewers point out that Hardy's occupation involves a sedentary level of physical demand, they fail to explain how Hardy's chronic pain in his pelvis would not materially disrupt his ability to sit for long periods.

22.     The Court also considered Ken Askew's Independent Employability Assessment.  Askew, an independent vocational expert, determined that Hardy was working at his maximum vocational capacity on a part-time basis.  And during his 2-1/2-hour interview with Hardy, Askew personally observed that Hardy's energy level, rate of speech, and overall demeanor diminished.  Askew also opined that the vocational descriptions provided to Unum's medical reviewers were incomplete and failed to adequately describe the material duties of Hardy's occupation.  The fact that an independent vocational reviewer who personally observed Hardy's susceptibility to fatigue reached the conclusion that Hardy remained incapable of working full-time as a medical malpractice trial attorney supports a finding that Hardy remained disabled.

23.     Two other factors support a finding that Hardy remained disabled.  First, the Court has found no evidence of significant improvements in Hardy's condition in the record.  In a termination of benefits case, "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002).  This does not shift the burden to Unum; it is instead just a consideration.  *See id.*  There may have been some

improvement in Hardy's peripheral neuropathy and other symptoms which were the basis of granting his disability in the first place. But Dr. Vercellotti documented continuing problems. And there is no evidence of significant improvements in Hardy's fatigue or lack of stamina, for instance, that would have made it possible for Hardy to complete the material duty of preparing for and conducting trials. Because Hardy's symptoms and much of the other evidence remained largely consistent, the available information did not alter in some significant way.

24.    Second, there was also a lack of a significant change in Hardy's physical activities when Unum terminated his benefits. If an insurer terminates benefits based on a change in the claimant's activities, despite the fact that the insurer already knew about those activities, it cuts against the termination of benefits. *Morgan v. Unum Life Ins. Co. of Am.*, 346 F.3d 1173, 1177–78 (8th Cir. 2003). Unum based its termination of benefits in part on Hardy's level of physical activity. But Unum already knew about some of Hardy's physical activities when it recertified his benefits. Dr. Vercellotti's treatment records show that Hardy was regularly exercising under his care. *See id.*; *see also Kaminski*, 517 F. Supp. 3d at 863–64 (holding that Unum's prior approval of claimants claim, under the same definition of disability and with no evidence of significant change in claimant's condition, weighed against the propriety of Unum's decision). This factor therefore supports a finding that Hardy remained disabled.

25.     Ultimately, whether Hardy remained disabled on December 10, 2020 depends on the material duties of his occupation.  These required, among other things, interviewing clients and witnesses, taking and defending depositions, attending pre-trial hearings, and preparing for and conducting trial.  The record indicates that Hardy struggled to, among other things, type and write, to maintain attention for long periods of time, and to sit for long periods of time.  Additionally, Hardy's colleagues declared that Hardy was incapable of preparing for and conducting trials due to his limitations.  These limitations in connection with Hardy's other limitations—including his nausea and diarrhea—would render Hardy unable to complete his required material duties, particularly conducting trials or tasks requiring sustained attention or sitting for long hours or consecutive days.  Though there is mixed evidence in the record, and Hardy's claim may not have survived under an abuse of discretion standard, here the Court finds that the consistency of Hardy's reported symptoms, supporting medical records and research, Dr. Vercellotti's opinion and expertise, the Independent Employability Assessment, and the statements from Hardy's law partners and spouse corroborate Hardy's purported restrictions and limitations.  Thus, substantial evidence demonstrates that by a preponderance of the evidence Hardy could not have completed the material duties of his regular occupation as of December 10, 2020.

26.     Because he could not complete the material duties of his regular occupation, Hardy was disabled under the Policy as of December 10, 2020.  Therefore, Unum wrongfully terminated his benefits.

27.     Because Unum wrongfully terminated his benefits, the Court will grant Hardy's motion, deny Unum's motion, and order Unum to reinstate Hardy's benefits.

**B.     Award of Benefits**

28.     Hardy asks the Court to reinstate his benefits and require Unum to pay retroactive benefits to him through December 10, 2020.  In ERISA actions, the Court may clarify "rights to future benefits under the terms of the plan," such that it is authorized to issue orders related to future payments, not just back-benefits.  *See* 29 U.S.C. § 1132(a)(1)(B); *Welsh v. Burlington N., Inc., Emp. Benefits Plan*, 54 F.3d 1331, 1339–40 (8th Cir. 1995).

29.     Because Hardy does not have an ongoing duty to prove his disability, the Court will order Unum to pay retroactive benefits to Hardy through December 10, 2020, and reinstate Hardy's benefits until Unum determines that Hardy is not disabled under the Policy.

30.     Regarding the calculation of Hardy's monthly benefits, for the reasons stated below the Court will order Unum to calculate any owed and future benefits by pro-rating Hardy's annual partner distributions over the year in which they are received.[8]

31.     Examining the Policy's language, *Kitterman*, 632 F.3d at 448, the Court finds no clear direction on how annual partner distributions should be treated in the monthly benefit calculation.  The Policy states that if an insured is working part-time and "earning more than 20 [percent] of his indexed pre-disability earnings," then, after 12 months, the monthly benefit will be recalculated by a formula that subtracts the "monthly earnings" that the insured receives while he is disabled from the insured's indexed pre-disability earnings.  (POL 15.)  The Policy does not provide a definition for "monthly earnings."

32.     Because the Policy does not define "monthly earnings" that an insured receives while disabled, the Court must "accord policy terms their ordinary, plain meaning."  *Spizman v. BCBSM, Inc.*, 855 F.3d 924, 927 (8th Cir. 2017).  "Recourse to the ordinary, dictionary definition of words is not only reasonable, but may be necessary."  *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 955 (8th Cir. 2010) (citations omitted).

33.     When considering ambiguities in an ERISA plan, the Court must apply "federal law, not Minnesota law, construing disputed language 'without deferring to

---

[8] Because Unum clarified that it does not challenge the calculation of previously paid benefits, the Court need not consider Hardy's argument that Unum is now barred by the statute of limitations or failed to assert a compulsory counterclaim regarding this issue.

*either* party's interpretation.'"  *Spizman*, 855 F.3d at 927 (quoting *Brewer v. Lincoln Nat'l*

*Life Ins. Co.*, 921 F.2d 150, 154 (8th Cir. 1990)).

34.     "Earnings" are defined as  "[r]evenue gained from labor or services, from

the investment of capital, or from assets."  *Earnings*, *Black's Law Dictionary* (12th ed.

2024).  Because partner distributions are revenue gained from labor or services, the Court

finds that they qualify as "earnings."  This interpretation is consistent with Eighth Circuit

precedent, which holds that bonuses can be included in calculations for monthly disability

benefits.  *Riddell v. Unum Life Ins. Co. of Am.*, 457 F.3d 861, 863–64 (8th Cir. 2006); *see*

*also Neumiller v. Hartford Life & Accident Ins. Co.*, No. 22-35688, 2023 WL 4173022, at *2

(9th Cir. June 26, 2023) (concluding that trimester bonuses were "earnings" which could

be pro-rated over the months in which they were accrued rather than the month in which

the bonus was distributed).[9]  Accordingly, in calculating the monthly benefit, Hardy's

annual partner distributions should be pro-rated over the year in which they are received.

### C.     Attorney Fees and Costs

35.     Because the Court finds that Unum improperly terminated Hardy's benefits,

the Court must determine whether to award Hardy attorney's fees and costs.

---

[9] *See, e.g.*, *Lee v. Fortis Benefits Ins. Co.*, No. 03-3589, 2006 WL 777224, at *1 (D. Minn. Mar. 27, 2006) (considering an ERISA plan where the plan's language explicitly included bonuses in the disability earnings calculation and required them to be pro-rated over the time in which they accrued); *Fine v. Sun Life Assurance Co. of Can.*, 97 F. Supp. 3d 799, 808–13 (E.D. Va. 2015) (finding no abuse of discretion where insurer included insured's profit sharing bonus as disability earnings).

36.     ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  Although the decision to award attorney's fees and costs is discretionary, a court should "apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts." *Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006) (quoting *Welsh*, 54 F.3d at 1342).  "Therefore, although there is no presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails to receive fees." *Id.* at 1040–41.

37.     The Eighth Circuit has provided a list of five non-exclusive factors for courts to consider:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal qeustion [sic] regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984); *accord Starr*, 461 F.3d at 1041. The factors are general guidelines, *Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 972 (8th Cir. 2002), and no one factor is dispositive, *see Starr*, 461 F.3d at 1041.

38.     The Court will award Hardy reasonable attorney's fees and costs.  While there is no indication that Unum acted in bad faith, there is evidence that Unum failed to

exercise the care required of it throughout the administrative process. For instance, Unum's medical reviewers failed to properly explain how Hardy's physical activities were inconsistent with his symptoms or how those activities indicated that Hardy was capable of performing all the material duties of his occupation as a trial lawyer on a full-time basis. An award of attorney's fees would also be consistent with ERISA's remedial nature, as awarding attorney's fees here may deter administrators from mishandling claims with similar records. *See id.* Moreover, there is no indication that Unum is unable to pay attorney's fees. *See e.g.*, *Kaminski*, 517 F. Supp. 3d at 869.

39.     Before the Court can make a final award of attorney's fees, however, Hardy must submit an affidavit supporting his reasonable attorney's fees and costs. Prior to submitting the affidavit, the parties must meet and confer to attempt to resolve any differences on the reasonableness of the fees and costs.

### D.     Prejudgment Interest

40.     Hardy seeks prejudgment interest on the award of past due long-term disability benefits.

41.     Although ERISA does not expressly provide for prejudgment interest, prejudgment interest awards are permitted by 29 U.S.C. § 1132(a)(3)(B), which allows a court to award "other appropriate equitable relief" in ERISA cases. *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1006 (8th Cir. 2004). Courts have discretion to award prejudgment interest. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330 (8th Cir. 1995). Awarding prejudgment interest is appropriate unless "exceptional or unusual

circumstances exist making the award of interest inequitable." *Id.* at 1331 (citation omitted).  The purpose of such an award is to compensate the prevailing party and to prevent a wrongdoer's unjust enrichment.  *Christianson v. Poly-Am., Inc. Med. Benefit Plan*, 412 F.3d 935, 941 (8ᵗʰ Cir. 2005).

42.     Because the Court finds that Unum improperly terminated Hardy's disability benefits and there are no exceptional or unusual circumstances, the Court will award prejudgment interest.

43.     Before calculating the award of prejudgment interest, Hardy must submit an affidavit calculating his past due long-term disability benefits from December 10, 2020 through the present.  Additionally, the parties must meet and confer to attempt to resolve any differences on the appropriate prejudgment interest rate before Hardy files an affidavit.  If the parties do not agree to a prejudgment rate, the parties must submit briefs to the Court with their positions on the appropriate rate.

**ORDER FOR JUDGMENT**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED AND DECLARED** that:

1. Defendant's Motion for Judgment on the Administrative Record [Docket No. 25] is **DENIED**;

2. Plaintiff's Motion for Judgment on the Administrative Record [Docket No. 31] is **GRANTED**;

3. Defendant is ordered to pay Plaintiff damages in the amount of all his unpaid long-term disability benefits from the date of termination to the present, in an amount to be determined;

4. Defendant is ordered to reinstate Plaintiff's long-term disability benefits;

5. Defendant is ordered to calculate any owed and future benefits by pro-rating Plaintiff's annual partner distributions over the year in which they are received;

6. Plaintiff's request for reasonable attorney fees, costs, and prejudgment interest is **GRANTED**;

7. The parties are ordered to meet and confer to discuss the amount of benefits owed, the reasonableness of Plaintiff's attorney fees and costs, and the proper calculation of prejudgment interest;

8. If the parties agree on the amounts, the parties shall submit a joint proposed judgment within 28 days after entry of this Order; and

9. If the parties disagree:

    a. Plaintiff shall submit an affidavit substantiating his attorney's fees and costs incurred in this matter and a brief addressing his positions on the benefits owed and on prejudgment interest including calculating the interest owed within 28 days after entry of this Order; and

    b. Defendant may submit a response to Plaintiff's attorney's fees and costs affidavit and a brief explaining its positions on the benefits owed

and on prejudgment interest including calculating the interest owed

within 14 days after Plaintiff submits his filings.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  September 4, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge